Elizabeth Susan UNGER, Lieutenant,
U.S. Navy, Appellant,

v.

Daniel ZIEMNIAK, Captain, U.S. Navy,
Military Judge, Appellee.

Misc. No. 89–05.

U.S. Court of Military Appeals.

Jan. 27, 1989

For Appellant: *Gary R. Myers, Esq.* (argued); *Lieutenant Robert J. Harvey,* JAGC, USNR (on brief); *Lieutenant Mary Anne Razim,* JAGC, USNR.

For Appellee: *Lieutenant Commander Lawrence W. Muschamp,* JAGC, USN (argued); *Captain Wendell A. Kjos,* JAGC, USN (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

In August 1988, Lieutenant Unger was charged with willfully disobeying the lawful order of a superior commissioned officer that she comply with a Naval directive—OPNAV Instruction 5350.4A—by giving a urine sample under direct observation by a female enlisted servicemember. *See* Art. 90, Uniform Code of Military Justice, 10 USC § 890. After a pretrial investigation had been conducted pursuant to Article 32 of the Code, 10 USC § 832, the charge was referred for trial by a special court-martial.

After arraignment, Lieutenant Unger made several motions contesting the legality of the order and seeking dismissal of the charge. The military judge denied the motions, whereupon Lieutenant Unger petitioned the United States Navy–Marine Corps Court of Military Review for extraordinary relief. Her petition was dismissed without prejudice. In turn, she petitioned this Court for extraordinary relief. We treated the petition as a writ-appeal petition, ordered a stay in her trial and thereafter heard oral argument to determine whether she was entitled to relief. 27 MJ 449 (1988).

I

*Facts*

Lieutenant Unger is a Naval Academy graduate with 8 years of unblemished service. In July 1988, she was required to provide a urine sample at Great Lakes Na-

val Training Center in connection with the drug-testing program authorized by OP-NAVINST 5350.4A. That directive calls for *"direct* observation" of the private parts of a person who is giving a urine specimen. Para. 1c, App. B to Encl. (4), OPNAVINST 5350.4A. Accordingly, a female chief petty officer insisted that Lieutenant Unger "disrobe from the waist down, sit on a toilet, and urinate into a collection bottle" while being observed from a distance of approximately 18 inches. Lieutenant Unger refused to comply with the conditions—although, without direct observation, she provided a sample which ultimately tested negative for drugs.

Because of her refusal to be directly observed, Lieutenant Unger was given "a direct oral order from" her executive officer "to comply with OPNAVINST 5350.4A and provide another sample under direct visual observation of" her "private parts." She refused this order because of her claimed constitutional rights to privacy and to freedom from unreasonable searches and seizures and also because, in her view, the direct observation by an enlisted person constituted fraternization and demeaned her status as an officer. Her refusal gave rise to the charge filed against her after she refused punishment under Article 15, UCMJ, 10 USC § 815.

## II

### *Jurisdiction*

#### A

If Lieutenant Unger were tried by a general court-martial and convicted of willful disobedience of an order of a superior officer, the maximum punishment imposable would be dismissal, 5 years' confinement, and total forfeitures. *See* para. 14e (2), Part IV, Manual for Courts–Martial, United States, 1984. However, a special court-martial is not permitted to adjudge a sentence upon an officer which extends to dismissal or confinement. Art. 19, UCMJ, 10 USC § 819, and RCM 1003(c)(2)(A)(ii), Manual, *supra* at II–148 (Ch. 3). For this reason charges against officers seldom are referred for trial by special court-martial, although it is perfectly permissible for a convening authority to do so.

Since a special court-martial cannot sentence a commissioned officer to dismissal or adjudge confinement, the conviction of an officer by a special court-martial can never qualify for review by a Court of Military Review pursuant to Article 66(b) of the Uniform Code, 10 USC § 866(b). Also, it would appear that a conviction in a special court-martial cannot be referred to a Court of Military Review under Article 69(a), UCMJ, 10 USC § 869(a)—although it can be reviewed by the Judge Advocate General under Article 69(b). Accordingly, there would seem to be no way that a conviction of an officer by a special court-martial would qualify for review by this Court under Article 67(b), UCMJ, 10 USC § 867(b), which states that the Court "shall review the record in" various cases reviewed by a Court of Military Review.[1]

#### B

Since Lieutenant Unger's case cannot qualify for review either by the Court of Military Review or by this Court, we must first inquire whether either the Court of Military Review or this Court has jurisdiction to entertain her petition for extraordinary relief. In this connection, we note that Article 67(b) provides that this Court *"shall* review" the record in certain cases; but this language does not necessarily signify that the Court has no discretionary jurisdiction to review certain other cases. Indeed, the Court's practice of issuing extraordinary writs is itself based on the premise that, in addition to the cases which

---

**1.** Despite the language of Article 69(a) and (b), appellate government counsel, under persistent questioning from the Court, asserted that, in the discretion of the Judge Advocate General, even a special court-martial conviction not accompanied by a discharge could be referred to the Court of Military Review for decision and that this had occasionally taken place. Moreover, according to him, the case could then be certified to our Court by the Judge Advocate General pursuant to Article 67(b)(2).

the Court "shall" review under Article 67(b), there are other cases that it "may" review on a different basis.[2]

In *United States v. Frischholz*, 16 USC-MA 150, 152, 36 CMR 306, 308 (1966), we stated that the Court of Military Appeals "is a court established by act of Congress within the meaning of the All Writs Act [28 USC § 1651(a)]." In *Gale v. United States*, 17 USCMA 40, 43, 37 CMR 304, 307 (1967), we concluded that the

> Court clearly possesses the power to grant relief to an accused prior to the completion of court-martial proceedings against him. To hold otherwise would mean that, in every instance and despite the appearance of prejudicial and oppressive measures, he would have to pursue the lengthy trial of appellate review—perhaps even serving a long term of confinement—before securing ultimate relief. We cannot believe Congress, in revolutionizing military justice and creating for the first time in the armed services a supreme civilian court in the image of the normal Federal judicial system, intended it not to exercise power to grant relief on an extraordinary basis, when the circumstances so require. We hold it did so endow us and the Government's contention to the contrary is ill-founded.

A year later—citing *Gale, Frischholz,* and other precedents—we stated:

> These comments and decisions certainly tend to indicate that this Court is not powerless to accord relief to an accused who has palpably been denied constitutional rights in *any* court-martial; and that an accused who has been deprived of his rights need not go outside the military justice system to find relief in the civilian courts of the Federal judiciary.

*United States v. Bevilacqua*, 18 USCMA 10, 11–12, 39 CMR 10, 11–12 (1968) (emphasis added).

In *Noyd v. Bond*, 395 U.S. 683, 695 n. 7, 89 S.Ct. 1876, 1883 n. 7, 23 L.Ed.2d 631, 643 n. 7 (1969), the Supreme Court specifically approved the decision of this Court in *Frischholz* that, under the All Writs Act, we have the power to grant extraordinary relief in cases which we might ultimately review.

In *McPhail v. United States*, 1 MJ 457 (CMA 1976), this Court considered whether it had jurisdiction to grant extraordinary relief to an accused who had been convicted by a special court-martial but had received a sentence which, under Article 66(b), was not subject to review by the Court of Military Review and consequently not subject to review under Article 67(b) by this Court. The Government contended

> that this Court's power to act in connection with any court-martial is limited to the authority granted to it by Article 67 to review only specified cases and to the authority of the All Writs Act, 28 U.S.C. § 1651(a), to issue writs "in aid of its jurisdiction." Supported by citations to many decisions by this Court, the Government argues that the Court possesses only appellate jurisdiction, and its ancillary writ authority is strictly limited to a case already docketed in the Court or which can potentially reach the Court by appeal authorized by Article 67. As the petitioner's case can never reach this Court by way of appeal because it is a special court-martial conviction in which the sentence is not one that subjects the case to review by a Court of Military Review, and, consequentially, by this Court, the Government maintains that the Court has no authority to grant any sort of relief to the petitioner, notwithstanding his conviction is unconstitutional. *See Robinson v. Abbott*, 23 U.S.C.M.A. 219, 49 C.M.R. 8 (1974).

*Id.* at 459–60 (footnote omitted).

Rejecting the Government's contention,

---

**2.** In *Dettinger v. United States*, 7 MJ 216 (CMA 1979), this Court held that the Court of Military Review also is authorized to issue extraordinary writs. There, we adopted a similar premise that Article 66(b), which prescribes the cases that the Judge Advocate General "shall" refer to a Court of Military Review"—even as supplemented by Article 69(a)—does not preclude the Court of Military Review from granting extraordinary relief in certain other situations.

the Court pointed to various precedents[3] that sustained the conclusion that it could grant relief when court-martial proceedings violated the rights of service personnel under the Constitution or under the Uniform Code. The Court noted:

> In providing, for the first time, for review of courts-martial by a civilian tribunal established as part of the military justice system, rather than through collateral proceedings in other Federal civilian courts, Congress limited the appellate jurisdiction of this Court to what can be described as the more serious cases. However, the nature of the Court's role in the military justice system was perceived by the proponents of the Uniform Code and Congress in much larger terms than the relatively small number of cases subject to ordinary appellate review under Article 67.

*Id.* at 461.

Thus, the Court reasoned:

> In legislative intention and in judicial contemplation, ... this Court has judicial functions distinct from its authority to review for error, under Article 67, the small percentage of the total number of cases that annually are prosecuted under the Uniform Code.

*Id.* at 462. Concluding, the Court asserted that

> this Court is the supreme court of the military judicial system. To deny that it has authority to relieve a person subject to the Uniform Code of the burdens of a judgment by an inferior court that has acted contrary to constitutional command and decisions of this Court is to destroy the "integrated" nature of the military court system and to defeat the high purpose Congress intended this Court to serve. Reexamining the history and judi-

cial applications of the All Writs Act, we are convinced that our authority to issue an appropriate writ in "aid" of our jurisdiction is not limited to the appellate jurisdiction defined in Article 67....

Assuredly, there are limits to our authority, even as the highest court in the military justice system. *See Noyd v. Bond, supra,* 395 U.S. at 695 n. 7, 89 S.Ct. 1876. Whatever those limits are, as to matters reasonably comprehended within the provisions of the Uniform Code of Military Justice, we have jurisdiction to require compliance with applicable law from all courts and persons purporting to act under its authority.

*Id.* at 462–63.

*McPhail* has never been overruled by this Court;[4] and recently we cited it favorably in *United States Navy–Marine Corps Court of Military Review v. Carlucci,* 26 MJ 328, 331 (CMA 1988). Since *McPhail* was decided, Congress has acted several times to amend the Uniform Code in ways having directly to do with the status of this Court or its judges. Yet, on no occasion has Congress indicated any dissatisfaction with the scope of our All–Writs–Act supervisory jurisdiction, as we had explained it in *McPhail.* Indeed, instead of disapproving this Court's assertion in *McPhail* that it possessed "jurisdiction to require compliance with" the Uniform Code, Congress has consistently acted to strengthen the Court and enhance its image.

For example, in 1980 Congress directed that the judges of this Court file their financial disclosure forms with the Judicial Branch, rather than with the Executive Branch,[5] and provided that each new judge on this Court would be appointed to a full 15–year term of office, rather than to fill

---

**3.** *Gale v. United States,* 17 USCMA 40, 43, 37 CMR 304, 307 (1967); *United States v. Bevilacqua,* 18 USCMA 10, 11–12, 39 CMR 10, 11–12 (1968); *Johnson v. United States,* 19 USCMA 407, 42 CMR 9 (1970); Wacker, *The "Unreviewable" Court–Martial Conviction; Supervisory Relief Under the All Writs Act from the United States Court of Military Appeals,* 10 Harv. Civ. Rights–Civ.Lib.L.Rev. 33, 56, 92 (1975).

**4.** Judge Cook's concurring opinion *in Stewart v. Stevens,* 5 MJ 220 (CMA 1978), repudiated his opinion in *McPhail;* however, his later view has never commanded a majority in this Court.

**5.** Pub.L. No. 96–579, § 12(c), 94 Stat. 3369 (1980), 28 USC App I § 308(9).

an unexpired term.[6] In 1983 and again in 1988, Congress substantially improved the retirement benefits for the judges of this Court to better assure its independence and stability.[7]

The Military Justice Act of 1983 authorized the Supreme Court to review cases in which review had been granted by this Court.[8] This provision for Supreme Court review is significant in at least two ways. First, it allows an accused to take his case to the Supreme Court without undertaking collateral attack, which may be "a costly and difficult venture in view of the limited grounds for collateral review."[9] Our power to grant extraordinary relief in cases like that of Lieutenant Unger allows the accused to obtain judicial review of constitutional claims without being required to undertake expensive collateral attack in the Article III courts. Availability of extraordinary judicial relief within the military justice system reinforces "the 'integrated' nature of the military court system," *see* *McPhail v. United States,* 1 MJ at 462, and thereby it helps achieve an objective that Congress had in mind when it granted the Supreme Court jurisdiction to review our decisions on certiorari.

Second, the legislation which established certiorari jurisdiction of the Supreme Court over certain cases decided by this Court specifically included cases not reviewed by us under Article 67(b) of the Uniform Code but in which we "granted relief." *See* 28 USC § 1259(4). Thus, by authorizing the Supreme Court to review cases not considered by us on direct review under Article 67(b), Congress reaffirmed our jurisdiction to grant extraordinary relief. Moreover, it did so without questioning in any way *McPhail*'s premise that we possess jurisdiction to grant extraordinary relief when a court-martial is being conducted in violation of the accused's rights under the Constitution or the Uniform Code of Military Justice. *Cf. North Haven Board of Education v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982).

## C

More than 15 years before *McPhail* was decided, this Court had adverted to attempts to circumvent the requirements of the Uniform Code of Military Justice.[10] Our concern in this regard helped generate extensive congressional hearings on military justice[11]—which, in turn, led to enact-

---

**6.** Pub.L. No. 96–579, § 12(a), 94 Stat. 3369 (1980).

**7.** Pub.L. No. 98–94, § 1256, 97 Stat. 614, 701 (1983), and Pub.L. No. 100–456, § 722, 102 Stat. 1918, 2002 (1988).

**8.** Pub.L. No. 98–209, § 10, 97 Stat. 1393, 1405 (1983).

**9.** *See* H.Rep. No. 549, 98th Cong., 1st Sess. 16 (1983) U.S.Code Cong. & Admin.News pp. 2177, 2181.

**10.** In the Annual Report of the United States Court of Military Appeals for 1960 at 12, we stated:

The unusual increase in the use of the administrative discharge since the Code became a fixture has led to the suspicion that the Services were resorting to that means of circumventing the requirements of the Code. The validity of that suspicion was confirmed by Major General Reginald C. Harmon, then Judge Advocate General of the Air Force, at the Annual Meeting of the Judge Advocates

Association held at Los Angeles, Calif., August 26, 1958. He there declared that the tremendous increase in undesirable discharges by administrative proceedings was the result of efforts of military commanders to avoid the requirements of the Uniform Code. Although he acknowledged that the men thereby affected were deprived of the protections afforded by the Code, no action to curtail the practice was initiated.

**11.** When Senator Ervin opened congressional hearings in 1962 on the constitutional rights of military personnel, he noted that his Subcommittee on Constitutional Rights had been "especially mindful of the statement" by a Judge Advocate General of the Air Force referring to "efforts of military commanders to avoid the requirements of the Uniform Code." In this connection, Senator Ervin quoted the statement from the Annual Report of the United States Court of Military Appeals for 1960 set out in this opinion at n. 10, *supra. See* Hearings Pursuant to S.Res. 260 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 87th Cong., 2d Sess. 2 (1962).

ment of the Military Justice Act of 1968, Pub.L. No. 90–632, 82 Stat. 1335.

We are convinced that, from the outset, Congress has never intended to allow evasion of the safeguards provided to servicemembers by the Constitution and the Uniform Code. If, however, this Court lacked jurisdiction to grant extraordinary relief in cases like this, it would be easy to bypass those safeguards. Instead of separating servicemembers pursuant to punitive discharges adjudged by courts-martial—in which event, the accused might seek judicial review by the Court of Military Review, this Court, and the Supreme Court—a two-step process could be used which avoided judicial review within the military justice system. The servicemember could initially be tried and convicted by court-martial in a proceeding in which no discharge was adjudged or, if adjudged, was not "approved." Thus, no review under Articles 66(b) and 67(b) would be available. In turn, the court-martial conviction could be the basis for some type of administrative separation.

For example, if Lieutenant Unger is convicted by special court-martial, it seems probable that her career as a commissioned officer in the Navy will soon end—even though the special court-martial has not sentenced her, and could not sentence her, to a dismissal. Admittedly, her naval service would not end under the same conditions of stigma as if she were sentenced to dismissal. However, as a foreseeable result of the court-martial conviction, she would lose many of the benefits of her training at the Naval Academy and her 8 years of military service.

If, as Lieutenant Unger claims, her trial by court-martial violates her constitutional rights, we are convinced that we have juris-

diction to grant extraordinary relief. Congress never intended that this Court sit by helplessly while courts-martial are misused in disregard of an accused servicemember's rights under the Constitution or the Uniform Code. Accordingly, under the circumstances of this case, we are convinced that we have jurisdiction to grant extraordinary relief.

## III

### *Exercise of Jurisdiction*

To say that this Court has extraordinary-writ jurisdiction is not to say that we should exercise it. Instead, as we have made clear, this jurisdiction should be exercised sparingly. *See, e.g., Murray v. Haldeman,* 16 MJ 74, 76 (CMA 1983); *Shepardson v. Roberts,* 14 MJ 354, 357 (CMA 1983).[12] Applying the criteria set forth in *Murray v. Haldeman, supra,* it is appropriate for this Court to exercise its jurisdiction and consider the merits of Lieutenant Unger's petition.

In its answer to her petition, the Government has emphasized the importance of the drug-testing program for the armed services. Appellate government counsel cites statistics which indicate a remarkable drop in the use of drugs among servicemembers since testing was instituted.[13] Because compulsory urinalysis has been successful in detecting and deterring drug use, it has been widely employed in all the armed services. During oral argument, appellate government counsel stated that some 2,000,000 drug tests are performed annually in the Navy alone. Furthermore, there are many women who, like Lieutenant Unger, are serving in the Navy at the present time and are legitimately concerned with

---

12. However, a leading commentator has suggested that the Court of Military Appeals should be more liberal than other courts in exercising its extraordinary-writ jurisdiction. *See* Cooper, *Extraordinary Writ Practice in Criminal Cases: Analogies for the Military Courts,* 98 F.R.D. 593 (address delivered at the Eighth Annual Homer Ferguson Conference on Appellate Advocacy on May 18, 1983).

13. According to the record of trial—albeit unauthenticated—the executive officer of the Navy Drug Screening Laboratory, Norfolk, Virginia, testified in this proceeding that, from 1982 to 1988, positive results in tests for drug abuse have dropped from 20–30 percent of those tested to 2–3 percent.

the conditions under which they may be required to submit to a urine test.[14]

Under these circumstances "the issues raised in this case are 'recurrent,' and unless we deal with them now, they will inevitably face us in many other cases in the future. The questions posed in this Navy case are common to all the armed services..."; and "the issues raised by" appellant "have broad ramifications." *See* 16 MJ at 77. Moreover, the constitutional issues raised by mandatory drug testing obviously are of concern not only to the armed services but also to our entire society. Indeed, two significant drug-testing cases recently were argued in the Supreme Court and currently await decision. *National Treasury Employees Union v. Von Raab*, No. 86–1879; *Burnley v. Railway Labor Executives' Assn.*, No. 87–1555.

Reflecting on the importance and scope of the drug-testing program in the armed services and the likelihood that the issues raised in Lieutenant Unger's court-martial will confront the Court in many future cases, and having the benefit of excellent briefs and arguments on the relevant issues, we are convinced that, in the proper exercise of our discretionary jurisdiction to grant extraordinary relief, we should consider the merits of this case.

## IV

### Merits

#### A

In *United States v. Trottier*, 9 MJ 337 (CMA 1980), this Court emphasized the significance of the drug program for the armed services. We pointed out:

As military equipment has become more sophisticated, there is the concomitant increased risk that an operator will be unable to handle the complicated weapons system with which he is entrusted and upon which his safety and that of others may depend. This risk, disturbingly, often cannot be obviated by keeping a person under the influence of a drug off the job for, unlike use of alcohol, there frequently are only marginally visible indications of the influence of drugs. Even when the user is not then under the influence, there may be dangerous psychological pressures on him which, themselves, could affect his performance adversely. Moreover, all this may be said of the serviceperson performing what may be perceived as the most routine and mundane duty, for there is no individual in our modern armed forces whose performance may not touch others in a significant way.

Without the maintenance of a credible armed force, the United States is at a serious military and geopolitical disadvantage. The need is overwhelming to be prepared to field at a moment's notice a fighting force of finely tuned, physically and mentally fit men and women—and satisfaction of that need is not compatible with indiscriminate use of debilitating drugs.

*Id.* at 345–46 (footnotes omitted). These observations made in *Trottier* in 1980 are still accurate now.

In *Murray v. Haldeman, supra,* we considered the constitutionality of compulsory urinalysis under a drug-testing program that had been instituted in the armed services late in December 1981. Our conclusion was that, although the questioned testing involved a "seizure" of urine within the meaning of the Fourth Amendment, this seizure was reasonable.[15] In reaching this conclusion, we relied especially on the ad-

---

14. At one point in his oral argument before us, appellate government counsel stated that "about 35% of our force is presently female, or so I'm told on good authority." He suggested that the percentage of women tested for drugs was about the same. Later, he indicated that the 35% estimate related to new accessions rather than "our present force structure." Although we suspect that in either respect the percentage is exaggerated, it is clear that a significant percent-

age of drug tests in all the armed services are performed on women.

15. Similarly, in *United States v. Middleton*, 10 MJ 123 (CMA 1981), we had concluded that the traditional military inspection constituted a "search" for Fourth–Amendment purposes but that this "search" was reasonable.

verse effect of drugs on performance of the military mission and the great value of compulsory urinalysis in detecting and deterring drug abuse.

The premises on which that case relied also are still valid. The experience of recent years makes clear that mandatory drug testing of servicemembers contributes substantially to reduction of drug use in the armed services and to making the military community drug free.[16] In our view, compulsory urinalysis is appropriate and necessary to maintain the effectiveness of the military establishment.[17]

Lieutenant Unger insists, however, that even if mandatory drug testing is reasonable, her superiors sought to make her provide a urine specimen under conditions that were humiliating and degrading and, so, violated the guidelines established by *Murray v. Haldeman, supra.* In effect, she is contending that, by use of a direct order, her military superiors were attempting to accomplish an unreasonable—and therefore unconstitutional—"seizure" of her urine.

In this connection, she insists that it was unreasonable to require that she give a urine specimen under "direct observation." As Lieutenant Unger emphasizes, "direct observation" is not required currently in civilian drug-testing programs, unless there is reason to believe that a particular individual to be tested may substitute a urine specimen. *See* Federal Personnel Manual, FPM Letter 792–16 (November 28, 1986). Moreover, until recently direct observation

was only required in collecting the urine specimens of male servicemembers, and alternate procedures were employed for female servicemembers.[18]

Undoubtedly, for many persons it is unpleasant and disagreeable to urinate while being directly observed by someone else. However, we also realize that there are cavities in the body where small quantities of urine can be secreted for purposes of substitution in the event of a drug test; and only by direct observation can this tactic be prevented. Indeed, many tricks have been used to avoid detection by compulsory urinalysis. There are reports of persons who sell drug-free urine to others who, in turn, will substitute pure urine for their own urine when a specimen is being collected. A leading athlete has described how he concealed some drug-free urine on his body for purposes of substitution if he was required by the National Football League to submit a urine specimen. *See* L. Taylor and D. Falkner, *L.T.: Living on the Edge* (Times Books, New York, 1987). Only recently, we reviewed the case of a female commissioned officer who had devised still another scheme to defeat the Air Force's drug-testing program. *See United States v. Norvell,* 26 MJ 477 (CMA 1988).

■ In view of the varied tactics which may be employed to evade drug testing, we conclude that it is not unreasonable *per se* for the Navy to require "direct observation" when urine specimens are collected.

---

16. Evidence offered in this proceeding indicates that the reduction in the use of drugs among servicemembers since 1982 has been about 90 percent. Even though drug testing undoubtedly does not deserve sole credit for this improvement, we are convinced that it performed a significant role.

17. Because of the impact of drug abuse on the performance of the military mission, we believe that mandatory drug testing in the military community is not necessarily subject to the same limitations that would be applicable in the civilian society. *See Solorio v. United States,* 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987); *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); *Chappell*

*v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).

18. Paragraph IVD.1 of DOD Instruction 1010.1, dated April 4, 1974, provides that "urine specimens ... for male service members" must be collected "under direct observation"; but "alternate procedures which insure that a valid specimen is obtained may be used for female service members." Paragraph 1c to Enclosure 1 of OPNAV Instruction 5355.1, dated January 25, 1975, provided that "[urine] specimens shall be collected under direct observation for male service members," but for female members they should be collected "under conditions of sufficient security to ensure that a valid specimen has been submitted."

Otherwise, the temptation and opportunity for evasion are too great.

■ Lieutenant Unger also complains that she was to be directly observed by an enlisted person while she provided the urine specimen. Although her pleadings are phrased in terms of fraternization, her real complaint is that, in the hierarchical military society, it is demeaning and degrading for an officer to be observed by an enlisted person while she performs an activity that typically is performed in private.

However disagreeable it may be for an officer to be observed under such circumstances by an enlisted person, we believe that the need to prevent evasion of the drug-testing program justifies the surveillance. We recognize the importance of maintaining the military hierarchical structure reflected in rank, but we doubt the practicality of requiring that a person giving a urine specimen be of lower rank than the observer.

Furthermore, to exempt officers entirely from the requirement of "direct observation" would ignore the lesson that officers, like enlisted persons, may yield to the temptation of drugs and use tricks to avoid detection. The armed services are sufficiently egalitarian that *every* person in the armed services may be required to provide a urine specimen under direct observation. Although rank has its privileges, favored treatment in drug testing is not one of them.[19]

Lieutenant Unger insists that, for physiological and psychological reasons, the requirement for "direct observation" is more offensive and degrading for a female than for a male. We recognize that in the military context males and females are not totally fungible.[20] Therefore, Congress has limited the use of women for combat

purposes and does not require them to register for the draft. *See Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). Furthermore, for many years, the armed services apparently allowed use of alternatives to the direct observation of females giving urine specimens.

■ Our conclusion, however, is that, even though as a policy matter the armed services could modify the current procedures for collecting urine from female servicemembers, they may require direct observation for females as well as for males. In our opinion, such observation of females does not inevitably transmute collection of urine specimens into an unreasonable "seizure" of the urine.

Although we reject Lieutenant Unger's claim that direct observation of the collection of urine from females is unconstitutional, a caution is in order. Direct observation can be performed in different ways and from different distances. If the eyes of the observer are too close to the genitalia of the person giving the urine specimen, the process of obtaining this specimen would be unduly humiliating and degrading and would violate the precepts of *Murray v. Haldeman, supra.* Likewise, even though a male gynecologist may examine a woman's vagina for medical purposes, we believe it would be clearly unreasonable for male servicemembers—even if medical corpsmen—to serve as "observers" of women who have been required to give urine specimens.[21]

**B**

■ In a prosecution for disobedience, lawfulness of the command is an element of the offense. *See* Arts. 90(2), 91(2),

---

19. Evidence in this proceeding indicates that the female observer who was assigned to observe Lieutenant Unger had also directly observed a female admiral who was providing a urine specimen.

20. However, in *United States v. Smith*, 27 MJ 242, 249 (CMA 1988), we rejected a government contention that the "experience" of females is so unique that they may be specially selected to

serve as court members in certain kinds of cases.

21. OPNAV Instruction 5350.4A provides that "the direct observation" shall be performed by a person "of the same sex as the member providing the" urine specimen. Para. 1c, App. B to Encl. 4 of OPNAVINST. 5350.4A.

and 92(1) and (2), UCMJ, 10 USC §§ 890(2), 891(2), and 892(1) and (2), respectively. An order is presumed to be lawful, *see United States v. Austin*, 27 MJ 227, 231–32 (CMA 1988); but the presumption may be rebutted. Thus, an order requiring the recipient to provide a urine specimen is illegal—and therefore unenforceable—if the order provided for collection of urine under humiliating and degrading conditions, as proscribed by *Murray v. Haldeman, supra*, and authorities relied on therein. If, in a trial for disobedience, the military judge determines from undisputed facts that the order was illegal, he should dismiss the charge.

 If, in a trial by members, the military judge determines that no evidence has been offered to rebut the presumed legality of the order to provide a urine specimen, he need not advise the members as to what facts might rebut the presumption. If, however, he concludes from all the evidence that an issue exists as to whether the servicemember had been ordered to provide the specimen under unreasonable conditions, he should submit the issue to the court members for their consideration. In that event, his instruction would be that, unless the members have been convinced beyond a reasonable doubt that the requirements for producing the urine specimen—including the manner in which the direct observation was to be performed—were reasonable and not unduly humiliating or degrading, the order was illegal and the accused should be acquitted. Of course, in a trial by military judge alone, he must determine beyond a reasonable doubt that the order contemplated "seizure" of the urine specimen under reasonable conditions.

 In this case, the military judge apparently did not conclude from the evidence before him that the order was illegal.

Therefore, he did not dismiss the charges; and on the record before us, we agree with this decision.

At trial the evidence may raise the issue of the legality of the order received by Lieutenant Unger.[22] In that event, unless trial by members has been waived, the judge should instruct the members that they must determine whether the order given to Lieutenant Unger required her to provide a urine specimen under conditions that were not humiliating and degrading.

V

The decision of the United States Navy–Marine Corps Court of Military Review denying the petition for extraordinary relief without prejudice is affirmed. The stay of court-martial proceedings is dissolved. The case is returned to the military judge for further proceedings.

Judge SULLIVAN concurs.

COX, Judge (concurring in part):

As I stated in *United States v. Cole*, 24 MJ 18, 27 (CMA), *cert. denied*, —— U.S. ——, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987), "[I]t is fundamental black-letter law that every court has the power to determine the question of its jurisdiction over the persons and subject matter coming before it." Accordingly, it was appropriate for us to entertain Lieutenant Unger's petition for extraordinary relief. Having heard her complaint, I am now satisfied that her case does not warrant this Court's exercise of jurisdiction over an "ordinary" special court-martial not empowered to sentence her to be dismissed from the Navy or to be confined.

The urinalysis in question was to have been one of some 2,000,000 conducted that

---

22. There was testimony that, although usually it is easier for a female to urinate into a bottle with a wider opening than would customarily be used in obtaining a specimen from a male, and although the Navy has authorized use of such bottles for collecting urine specimens from women, a container with a narrow opening was being used for both males and females at Lieu-

tenant Unger's military installation. On the other hand, we do not know if at trial there will be evidence as to whether, in order to assuage her concerns, Lieutenant Unger was offered any alternative procedures—such as direct observation by a doctor or a strip search or cavity search for a concealed urine specimen immediately before providing her specimen.

year by the Navy alone, and the program has now been in place for many years. The lawfulness of this particular order, therefore, is hardly such an extraordinary matter that it constrains us to decide the question before the factfinder has had the opportunity to do so.

Like "[t]he fog [that] comes on little cat feet," * it now appears that the dissents in *Jones v. Commander*, 18 MJ 198, 200 (CMA 1984), and *Dobzynski v. Green*, 16

MJ 84, 86 (CMA 1983) (this Court has jurisdiction over certain nonjudicial punishments), have crept their way into majority status and are now the law of this Court. I do not need to reach this expansive conclusion here.

I would dismiss the petition without prejudice to Lieutenant Unger's right to raise any and all defenses she may have to the legality of the order. *Murray v. Haldeman*, 16 MJ 74 (CMA 1983).

* C. Sandburg, "Fog," *Complete Poems* 33 (1950).