James T. GOLDSMITH, Major, U.S. Air Force, Petitioner/Appellant,

v.

President William J. CLINTON; Secretary of Defense William S. Cohen; Acting Secretary of the Air Force F. Whitten Peters; Acting Secretary of the Army Robert M. Walker; Lieutenant General John C. Griffith, Vice Commander, HQ Air Education and Training Command, Randolph Air Force Base, Texas; Colonel Marvin Nickels, Commandant, U.S. Disciplinary Barracks, and Colonel Gatrell, Commander, Munson Army Hospital, both of Fort Leavenworth, Kansas, Respondents/Appellees.

Misc. No. 97–8012.
Crim.App. Misc. No. 96–14.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 3, 1997.

Decided April 29, 1998.

For Appellant: *John M. Economidy* (argued).

For Appellee: *Lieutenant Colonel Michael J. Breslin* (argued); *Colonel Theodore J. Fink* (on brief); *Colonel Brenda J. Hollis.*

*Opinion of the Court*

EVERETT, Senior Judge:

As a result of Major Goldsmith's participation in unprotected vaginal intercourse with two women—a fellow officer and a civilian—while he was HIV-positive, he was tried by general court-martial on two specifications of willfully disobeying a "safe sex" order from a superior officer, two specifications of assault with a means likely to produce death or grievous bodily harm, and one specification of assault on a superior commissioned officer. *See* Arts. 90 and 128, Uniform Code of Military Justice, 10 USC §§ 890 and 928, respectively. Contrary to his pleas, he was found guilty as charged, except that he was acquitted of assault on a superior officer and instead convicted of the lesser-included offense of assault consummated by a battery. His sentence was confinement for 6 years and forfeiture of $2,500.00 pay per month for 72 months. Under this sentence, which the convening authority approved as adjudged, Goldsmith was to remain in confinement as an Air Force officer for 6 years, less any subsequent remission of sentence or credit for good behavior, and he was to receive his regular monthly pay and allowances as a major, less the forfeitures imposed by the court-martial.

The Court of Criminal Appeals affirmed the findings and sentence of the court-martial, but Major Goldsmith did not petition this Court for review. Subsequently, on December 20, 1996, his counsel filed with the Court of Criminal Appeals a pleading styled "Writ Appeal Petition for Extraordinary Relief" and a "Brief to Support Writ Appeal Petition for Extraordinary Relief." The gravamen of this "petition" was that, at the Fort Leaven-

worth Disciplinary Barracks where Goldsmith was serving his sentence, an interruption had occurred in his receipt of an HIV medication. Petitioner's counsel represented then—as he also did during oral argument in our Court—that the failure to receive the medication was life-threatening.

On January 9, 1997, the Court of Criminal Appeals denied the petition by *per curiam* opinion. Two weeks later, Major Goldsmith filed with this Court the combined Petition for Extraordinary Relief and Writ Appeal now being considered. Therein, he not only reiterated his request that he be assured a continuous supply of HIV medication while in confinement, but he also asked this Court to prevent his being dropped from the rolls of the Air Force pursuant to the provisions of a recently enacted law. *See* 10 USC §§ 1161 and 1167. Petitioner named as respondents the President and various other members of the Executive Branch.

Soon after receiving the petition, this Court entered an order directing the deferral of any administrative action to drop petitioner from the rolls. Then the Court heard argument on the petition with respect to the issue of the constitutionality of applying to Major Goldsmith a statute which was enacted after his offenses had been committed and also after the adjudging of his sentence. During the argument, we were informed by petitioner's counsel that he had been released from confinement and is now performing duty as a commissioned officer while the

Air Force prepares to proceed with administrative action to drop Goldsmith from its rolls whenever this Court allows it to do so.

I

A

At the outset, the Government contests Major Goldsmith's right to petition this Court for extraordinary relief concerning his sentence, the conditions under which it is served, or the threatened dropping from the rolls. In this connection, the Government emphasizes that Major Goldsmith never petitioned this Court for discretionary review under Article 67, UCMJ, 10 USC § 867; and it suggests that because of this omission, he is now barred from invoking this Court's jurisdiction.

Our interpretation of the All Writs Act, 28 USC § 1651(a), is broader than the Government's. Thus, in *Unger v. Ziemniak,* 27 MJ 349 (CMA 1989), we considered a writ-appeal petition that had been submitted by a naval officer being tried by special court-martial. That case could never have reached this Court on direct review because a special court-martial is not empowered to adjudge for an officer a sentence which is eligible for direct review by a Court of Criminal Appeals under Article 66, UCMJ, 10 USC § 866,[1] and therefore the case could not be directly reviewed by this Court under Article 67.[2] Our premise in *Unger,* as well as in several other cases,[3] was that Congress intended for this

---

1. Under Article 66(b)(1), "The Judge Advocate General shall refer to a Court of Criminal Appeals the record in each case of trial by court-martial in which the sentence, as approved, extends to death, dismissal of a commissioned officer, cadet, or midshipman, dishonorable or bad-conduct discharge, or confinement for one year or more...." Special courts-martial may not adjudge "death, dishonorable discharge, dismissal, confinement for more than six months...." Art. 19, UCMJ, 10 USC § 819.

2. Article 67 only provides for review by this Court of cases which have been reviewed by a Court of Criminal Appeals.

3. *See, e.g., United States v. Hardy,* 17 USCMA 100, 37 CMR 364 (1967) (a petition for review of the validity of a conviction by direct appeal was outside the scope of Article 67); *United States v.*

*Frischholz,* 16 USCMA 150, 151–52, 36 CMR 306, 307–08 (1966) (Article 67 does not describe the full powers of this Court; rather, the Court also possesses incidental powers as part of its responsibility under the UCMJ to protect the constitutional rights of members of the armed forces); *Gale v. United States,* 17 USCMA 40, 42, 37 CMR 304, 306 (1967) (Congress intended to grant this Court "supervisory power over the administration of military justice," as well as the authority in certain circumstances to grant relief in pending court-martial proceedings); *United States v. Bevilacqua,* 18 USCMA 10, 39 CMR 10 (1968) (this Court has the power to grant relief on an extra-ordinary basis to protect the constitutional rights of servicemembers); *McPhail v. United States,* 1 MJ 457, 460 (CMA 1976) ("[A]n accused who has been deprived of any fundamental right under the Uniform Code 'need not go outside the military justice system to find

Court to have broad responsibility with respect to administration of military justice.

■ Keeping *Unger* in mind, we conclude that, if this Court is empowered to grant extraordinary relief in a case that it cannot possibly review directly, it is also empowered by the All Writs Act to grant extraordinary relief in a case in which the court-martial rendered a sentence that constituted an adequate basis for direct review in this Court after review in the intermediate court.

■ Moreover, in our view, Goldsmith's failure to petition this Court for discretionary review pursuant to Article 67 did not waive or otherwise affect our extraordinary-writ jurisdiction in connection with this case.

### B

■ Unlike most cases reviewed by this Court or by the Courts of Criminal Appeals, the issue that first gave rise to a petition by Goldsmith for extraordinary relief is not reflected in any way in the record of trial or in the post-trial review. Instead, that issue concerned the manner in which the sentence to confinement was being carried out. Although we doubt that Congress intended for either this Court or the Courts of Criminal Appeals to review details of prison administration, we are persuaded that not every aspect of an appellant's service of a prison sentence imposed by a court-martial is immune from review under the All Writs Act. *See United States v. Coffey*, 38 MJ 290 (CMA 1993).

■ For example, if a servicemember under sentence to confinement were kept in confinement by the commandant of a disciplinary barracks after that sentence, as properly computed, had been served, either our Court or the Court of Criminal Appeals

would have authority to order a release from confinement, rather than require that the servicemember seek a writ of *habeas corpus* from a federal district judge in the district where he was confined. Likewise, in view of the prohibition against "cruel or unusual punishment" specifically included in Article 55, UCMJ, 10 USC § 855, we are convinced that under the All Writs Act either this Court or the Court of Criminal Appeals can grant extraordinary relief against such punishment inflicted upon servicemembers serving a court-martial sentence to confinement—especially when the sentence adjudged was sufficient to authorize review under Articles 66 and 67. Of course, this power should be exercised sparingly because, in most instances, there will be simpler remedies available for an appellant—such as complaints under Article 138, UCMJ, 10 USC § 938, complaints to the Inspector General of the service involved, or even exercise of a servicemember's statutory right to communicate with his representative in the Congress. *Cf. United States v. Coffey, supra.*

### C

■ In December 1996, Major Goldsmith claimed in his petition that suspension of his HIV medication was life-threatening. If such suspension of needed therapy was imposed as punishment, this would clearly seem "unusual" and probably "cruel" as well.[4] The Court of Criminal Appeals rejected the petition and, having respect for the integrity and competence of military doctors and Army hospitals, we are skeptical as to Major Goldsmith's claims of having been subjected to vindictive or retaliatory medical treatment while he was at Fort Leavenworth. In any event, petitioner's release from confinement has now mooted his claim as to

relief in the civilian courts of the Federal judiciary.'"); *Cooke v. Orser*, 12 MJ 335 (1982) (this Court granted extraordinary writ directing military judge to dismiss charges and deny authorities the right to prosecute appellant by court-martial as a result of due process violation); *United States Navy–Marine Corps Court of Military Review v. Carlucci*, 26 MJ 328 (CMA 1988) (Because this Court is removed from the influences of the Department of Defense and has the

power to freely question executive regulation or action, it therefore possesses extraordinary-writ jurisdiction to address unlawful command influence originating with a civilian.).

4. Unlike the Eighth Amendment, Article 55 proscribes "cruel or unusual punishment"—although the caption of the article refers to "cruel and unusual punishments." We need not inquire in this case whether the Code's difference in phrasing has any practical significance.

improper medical treatment. However, when he initially petitioned this Court in January 1997, the issue was still open as to whether he had been subjected to a life-endangering deprivation of medicines needed to combat his HIV-positive condition. Therefore, having previously presented that issue to the Court of Criminal Appeals as called for by our Rules of Practice and Procedure, Major Goldsmith was entitled to bring that same issue to this Court by means of a writ-appeal petition.

The Government complains, however, that unlike the issue concerning medical treatment, the issue as to the Air Force's intended dropping of Major Goldsmith from the rolls has not previously been raised in the Court of Criminal Appeals. According to the Government, a separate petition on this matter should have been submitted initially to the Court of Criminal Appeals.[5]

Although we recognize the importance of an orderly progression of a case to our Court through an intermediate court and acknowledge the great value of receiving that court's views, our rules of appellate procedure are not ironclad in that regard and specifically recognize that there may be "good cause" to submit a petition initially to this Court.[6] Indeed, quite recently we entertained a petition by the news media for an extraordinary writ to direct that an investigation under Article 32, UCMJ, 10 USC § 832, be opened to the public, even though the petition had not been submitted previously to the Army Court of Criminal Appeals. *ABC, Inc. v. Powell*, 47 MJ 363 (1997).

While filing in the Court of Criminal Appeals in this case was permissible and might have been preferable, we disagree with the Government's contention that it was necessary. Therefore, just as in *ABC*, we decline to require filing a new petition in the Court of Criminal Appeals or to remand the existing petition for consideration by that court. Furthermore, consistent with the concept of "pendent jurisdiction"—which on at least one occasion has been advocated by the Government, *cf. United States v. Lockwood*, 15 MJ 1 (CMA 1983)—we conclude that Major Goldsmith's proper filing in this Court of a writ-appeal petition as to suspension of necessary medications allowed him to "piggyback" thereon, by also submitting a petition for extraordinary relief to this Court, wherein he not only contested suspension of medications, but also raised initially the issue of lawfulness of dropping him from the rolls of the Air Force. *See generally United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

In *United States v. Gorski*, 47 MJ 370 (1997), we adverted to judicial economy. Consolidation of issues and parties in a single proceeding is a customary way to expedite disposition of multiple issues in contention between the same parties or different parties. *Cf.* Fed.R.Civ.P. 18, 28 USC. Consolidation of multi-state litigation is another of many examples of this trend in the judicial process. With this in mind, we recognize that, in view of the stage of proceedings that had been reached in January 1997 as to the issue of life-endangering deprivation of medical treatment, considerable justification existed for Major Goldsmith's not filing initially in the court below his petition for extraordinary relief concerning the threatened dropping from the rolls. The All Writs Act contains no limitation of our power to consider a petition for extraordinary relief that has not been initially submitted in a Court of Criminal Appeals; and we see no reason to construe our Rules to require, in this case, a procedure that might produce delay and fragmentation.

## D

■ The Government also claims that Major Goldsmith waited too long to submit a

---

5. Under Rule 4(b)(1), Rules of Practice and Procedure, United States Court of Appeals for the Armed Forces, "Absent good cause, no such petition [for an extraordinary writ] shall be filed unless relief has first been sought in the appropriate Court of Criminal Appeals."

6. In any event, our rules of appellate procedure do not limit the jurisdiction of this Court. *See* Rule 4(c).

petition for extraordinary relief to prevent the threatened dropping from the rolls because such a petition must be filed "no later than 20 days after the petitioner learns of the action complained of." Rule 19(d) of our Rules of Practice and Procedure. According to the Government, this "action" was a notice to Major Goldsmith of the intent to drop him from the rolls.[7] This contention is somewhat at odds with the Government's contention that the issue of dropping Goldsmith from the rolls is not yet ripe for consideration by this Court and that this Court should await the taking of further administrative action. Although we recognize that it is a waste of judicial time to consider issues that are academic and may be mooted by failure to take administrative action, we also conclude that—at least by now—the Air Force's intent to drop Major Goldsmith from the rolls has been manifested sufficiently to warrant both his submission of a petition for extraordinary relief and our consideration of that petition. On the other hand, we do not believe the 20–day period prescribed by our Rules for filing the petition had run at the time it was filed in this Court.[8]

## II

At this point, we finally encounter the substantive question of the lawfulness of applying retroactively to Major Goldsmith a statutory amendment which took effect after his trial and conviction. Pub.L.No. 104–106, 110 Stat. 186—which also created Article 58b, UCMJ, 110 USC § 858b (§ 1122, 110 Stat. 463), that this Court considered in *Gorski*—added a new ground for dropping a commissioned officer from the rolls of any armed force (§ 563(b)(1), 110 Stat. 325). Prior to enactment of the amendment, which took effect on February 10, 1996, the President was authorized to drop from the rolls any commissioned officer "who has been absent

without authority for at least three months" or "who is sentenced to confinement in a Federal or State penitentiary or correctional institution after having been found guilty of an offense by a court other than a court-martial or other military court. . . ." Act of Aug. 10, 1956, ch. 1041, § 1, 70A Stat. 89. After enactment of the amendment, the President could also "drop from the rolls . . . any commissioned officer . . . who may be separated under [10 USC] § 1167 . . . by reason of a sentence to confinement adjudged by a court-martial." *See* 10 USC § 1161(b)(2). Section 1167 of Title 10—which was also added by Pub.L.No. 104–106—states:

> Except as otherwise provided in regulations prescribed by the Secretary of Defense, a member sentenced by a court-martial to a period of confinement for more than six months may be separated from the member's armed force at any time after the sentence to confinement has become final under chapter 47 of this title and the member has served in confinement for a period of six months.

§ 563(a)(1)(A), 110 Stat. 325.

■ Construing together §§ 1161 and 1167, we conclude that a commissioned officer sentenced by court-martial to more than 6 months' confinement may be dropped from the rolls—and thereby separated from the officer's armed force[9]—at any time after that sentence has become final, upon completion of any appellate review, and after service of confinement for 6 months. Of course, termination of military status would carry with it termination of any entitlement to pay and allowances.

■ Major Goldsmith maintains that application to him of the statutory amendment concerning dropping from the rolls violates the *Ex Post Facto* Clause of the Constitution because it applies a new punishment to con-

---

7. Under the applicable Air Force Instruction, a notice is given to the person who is being considered for the dropping from the rolls, and that person then has 10 days to submit a response. Para. 4.2.3, Air Force Instruction 36–3207 (1 September 1996).

8. In any event, the 20–day provision in our Rule does not deprive this Court of jurisdiction to

consider the petition; and the All Writs Act contains no such limitation on our jurisdiction.

9. According to paragraph 4.1.1, Air Force Instruction 36–3207, dropping from the rolls, in the present context, signifies termination of military status. In other contexts, dropping from the rolls may only refer to removal from the rolls of a particular unit.

duct that took place prior to enactment of the statute which authorized such punishment. We have considered—and upheld—in *Gorski* a similar contention with respect to Article 58b, which was also created by Pub.L.No. 104–106. We note that the double jeopardy prohibition is also involved because, as the Supreme Court has recently pointed out, "Although generally understood to preclude a second prosecution for the same offense, the Court has also interpreted this prohibition [the Double Jeopardy Clause] to prevent the State from 'punishing twice, or attempting a second time to punish criminally, for the same offense.'" *See Kansas v. Hendricks,* 521 U.S. 346, ——, 117 S.Ct. 2072, 2085, 138 L.Ed.2d 501 (1997), quoting *Witte v. United States,* 515 U.S. 389, 396, 115 S.Ct. 2199, 2204, 132 L.Ed.2d 351 (1995). Here, if Goldsmith's position is correct, a second "punishment" was being imposed upon him by Congress after he had already been tried and sentenced.

The Government insists that dropping from the rolls is only an "administrative" matter and does not concern punishment. This contention parallels the claim successfully made in *Hendricks* by the State of Kansas that civil commitment as a sexual predator was not "punishment" for purposes of the double jeopardy or *ex post facto* prohibitions—even though the commitment was triggered by charge or conviction of sexually violent conduct. Certainly to some extent, *Hendricks* supports the Government's position. For example, the label of "civil" used by the Kansas legislature was significant in persuading the Supreme Court that the commitment was not designed to be punitive. —— U.S. at ——, 117 S.Ct. at 2081–82.

In the present case, the provision as to dropping from the rolls was not labeled "punishment" and, unlike the amendment considered in *Gorski,* was not included in the

UCMJ. Instead, it is part of a chapter of Title 10 which concerns "Personnel." On the other hand, the amendment to 10 USC § 1161 and addition of 10 USC § 1167 are contained in the same public law that adds Article 58b and, taken in context, can be viewed as part of a package designed to deal with the same congressional concern that motivated passage of the "punitive" Article 58b. Indeed, termination of an officer's military status by dropping from the rolls—a termination resulting from punitive action taken pursuant to the UCMJ—would have the same effect of terminating pay that is imposed by Article 58b. Moreover, in terms of the context in which the recent provision for dropping from the rolls appears and the reference to dropping from the rolls in Article 4(d), UCMJ, 10 USC § 804(d), there is an associated stigma very akin to that involved in "punishment." Although the issue is a close one, we conclude that in order fully to accomplish the purposes of the *Ex Post Facto* and Double Jeopardy Clauses, we should treat this amendment as punitive and hold that it cannot be applied to Major Goldsmith.[10]

The writ-appeal petition is denied as moot.

The petition for extraordinary relief is granted. No action may be taken to drop Major Goldsmith from the rolls pursuant to the amendment to 10 USC § 1161.

Judge EFFRON did not participate.

COX, Chief Judge (concurring):

I write only to respond to Judge Gierke's dissent. He is, of course, correct that the action of dropping an officer from the rolls of the Air Force is an "administrative action." In that sense, the issuance of a Department of Defense (DD) Form 214 to an officer who has been dismissed by a sentence of a court-

---

10. We have considered the recent Supreme Court decision in *Hudson v. United States,* —— U.S. ——, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)(holding that the Double Jeopardy Clause does not bar criminal indictment following administratively imposed monetary penalties and occupational debarment for violation of federal banking statutes because the administrative proceedings were "civil" not "criminal"), which was

decided after argument of this case. Despite its relevance to the issues before us, we are still of the view that, under all the circumstances surrounding enactment of Pub.L.No. 104–106, the provision for "dropping from the rolls" was "punitive" for purposes of the Double Jeopardy Clause and, *a fortiori,* for purposes of the *Ex Post Facto* Clause.

martial is an administrative action. Thus, the Secretary of the Air Force may not drop an officer from the rolls in this circumstance without a sentence to confinement nor can he issue a DD Form 214 showing dishonorable service without a sentence to dismissal. Where Judge Gierke's opinion fails, in my judgment, is that he does not address the linkage between the sentence of the court-martial and the administrative action in the context of *ex post facto* laws. The only question presented by this case is whether the adoption of 10 USC § 1167 has *ex post facto* application to Major Goldsmith. Because it was enacted many months after his court-martial sentence had been adjudged, I concur with Senior Judge Everett that as to this appellant, the application of the statute is clearly *ex post facto*.

Judge Gierke's opinion also raises significant questions in my mind. For example, if 10 USC § 1167 is purely administrative in nature, does the servicemember have recourse to the Air Force Board for Correction of Military Records to attack his court-martial conviction? Judge Gierke equates the action in this case to "a decision to not promote the officer, to reassign the officer, to revoke the officer's security clearance, or to administratively separate the officer." Thus, I assume he would give the servicemember analogous remedies to correct administrative errors. On the other hand, perhaps Congress has created a situation where an officer is left totally exposed to the whimsical attitude of the Secretary concerned? My view is that Congress appropriately tied the Secretary concerned to the court-martial sentence with all of the attendant due process rights and judicial review.

The nexus between the court-martial process and the subsequent administrative action is so totally complete and intertwined that Congress clearly intended that the Secretary could only act under this statute pursuant to a proper conviction and sentence. Having said all of this, however, I am also convinced that once this Court has completed its review, the decision of the Secretary is totally discretionary. In this case, our jurisdiction extends only to the Constitutional *ex post facto* question. I entertain no thought

of venturing beyond the limits of this appropriate exercise of jurisdiction. *See Unger v. Ziemniak*, 27 MJ 349, 359 (CMA 1989) (Cox, J., concurring in part).

SULLIVAN, Judge (concurring):

I join the excellent opinion of my Brother, Judge Everett, and only write to highlight the fact that our Court must be accountable and responsible enough to step forward to correct the effect of this law which increased the punishment of Major Goldsmith. We should use our broad jurisdiction under the Uniform Code of Military Justice to correct injustices like this and we need not wait for another court to perhaps act. As was said in Isaiah 6:8:

> Also I heard the voice of the Lord, saying, **'Whom shall I send,** and who will go for us?' Then said I, **'Here am I; send me.'**

(Emphasis added.)

Our Court has the responsibility of protecting the rights of all servicemembers in court-martial matters. We should not shirk from this duty when a "second punishment," directly tied to his court-martial, is imposed on Major Goldsmith by an *ex post facto* law issued after his court-martial.

GIERKE, Judge, with whom
CRAWFORD, Judge, joins (dissenting):

In my view 10 USC § 1167 pertains to a collateral administrative consequence of Major Goldsmith's sentence that may or may not occur. This Court has no jurisdiction over administrative personnel actions.

Unlike Articles 57 and 58, UCMJ, 10 USC §§ 857 and 858, respectively, at issue in *United States v. Gorski*, 47 MJ 370 (1997), § 1167 is not part of the Uniform Code of Military Justice but, instead, is part of the United States Code pertaining to personnel matters. Also unlike Articles 57 and 58, which make forfeitures and reduction mandatory, 10 USC § 1167 is merely an enabling statute for a discretionary action that may or may not occur. It merely provides that Major Goldsmith *"may* be separated." (Emphasis added.)

Dropping an officer from the rolls (DFR) traditionally has been treated as an administrative measure separate from the court-martial. *See* Article of War 118, reprinted in Manual for Courts–Martial, U.S. Army, 1917, at 328; Article for the Government of the Navy (AGN) 38, reprinted in Naval Courts and Boards, 1937, at 465. In 1930, the Attorney General interpreted the congressional intent behind AGN 38 as

> not to impose additional punishment upon naval officers convicted of crime, but rather to promote the efficiency of the Navy and to maintain the high standard of its officer personnel by providing that officers who fail to maintain a certain standard of conduct may be dropped from the rolls and rendered ineligible for reappointment.

36 U.S.Op.Atty.Gen. 186, 188. Colonel Winthrop explained the purpose of dropping an officer from the rolls as follows:

> [T]he authority to drop is a special power conferred by Congress for the purpose of relieving the army of a useless member who has himself practically abandoned it, and the treasury from the obligation of paying for services no longer rendered. . . .

W. Winthrop, *Military Law and Precedents* 746 (2d ed.1920 reprint)(footnotes omitted).

In *Helmich v. Nibert,* 543 F.Supp. 725, 728 (D.Md.1982), the court said that DFR "is purely a nondisciplinary administrative action which carries no connotations, good or bad. . . ." In *Pickell v. Reed,* 326 F.Supp. 1086, 1089–90 (N.D.Cal.1971), the court drew a distinction between punitive and administrative actions and said:

> So long as an administrative discharge is not used as a disguise for punitive action, the military remains within proper bounds when it chooses to grant an administrative discharge without pressing for a court martial because of the individual's wrongful conduct.

In my view DFR is an administrative personnel decision, in the same category as a decision to not promote the officer, to reassign the officer, to revoke the officer's security clearance, or to administratively separate the officer for substandard performance. It is an action that does not flow from a court-martial sentence as a matter of law. Instead, the court-martial sentence is merely the basis on which the DFR action may be based, and it may or may not occur. I believe that we have no jurisdiction to interfere. Accordingly, I dissent.