*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————————

## UNITED STATES
Appellee

**v.**

## Travis D. PULLINGS, Staff Sergeant
United States Air Force, Appellant

**No. 22-0123**
Crim. App. No. 39948

Argued November 8, 2022—Decided April 14, 2023

Military Judge: Jason M. Kellhofer

For Appellant: *Major David L. Bosner* (argued); *Major Jarett F. Merk* (on brief); *Major Eshawn R. Rawlley* and *Mark C. Bruegger*, Esq.

For Appellee: *Major Brittany M. Speirs* (argued); *Colonel Naomi P. Dennis, Lieutenant Colonel Matthew J. Neil*, and *Mary Ellen Payne*, Esq. (on brief); *Lieutenant Colonel Thomas J. Alford* and *Major Jay S. Peer*.

Judge MAGGS delivered the opinion of the Court, in which Chief Judge OHLSON, Judge SPARKS, and Senior Judge STUCKY joined. Judge HARDY filed a separate opinion concurring in the judgment.

———————————

Judge MAGGS delivered the opinion of the Court.

Appellant asked the United States Air Force Court of Criminal Appeals (AFCCA) for sentence relief on grounds that he suffered cruel and unusual punishment, in violation of Article 55, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 855 (2018), and the Eighth Amendment of the Constitution, during a period of post-trial confinement in a civilian jail. *United States v. Pullings*, No. ACM 39948, 2021 CCA LEXIS 648, at *2-3, 2021 WL 5626313, at *1-2 (A.F. Ct. Crim. App. Nov. 30, 2021) (unpublished). The AFCCA, however, rejected Appellant's allegations of cruel and unusual punishment and affirmed his approved sentence. *Id.* at *2, 2021 WL 5626313, at *1. Appellant now asks us to reverse the AFCCA and remand the case for the AFCCA to reassess his sentence. Applying the test announced in *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006), we conclude that Appellant has not established that he suffered cruel and unusual punishment. Accordingly, we affirm the AFCCA.

In reaching this decision, we neither accept nor reject the Government's argument that we should overrule precedents in which this Court has considered matters outside the record when reviewing claims of cruel and unusual punishment. *See, e.g.*, *United States v. Pena*, 64 M.J. 259 (C.A.A.F. 2007); *United States v. Erby*, 54 M.J. 476, 477 (C.A.A.F. 2001). Because overruling these precedents would not affect the outcome of this case, we leave the issue of whether the Court should overrule them for another time.

**I. Background**

A military judge, sitting as a general court-martial, found Appellant guilty, consistent with his pleas, of two specifications of sexual assault of a child and three specifications of sexual abuse of a child, in violation of Article 120b, UCMJ, 10 U.S.C. § 920b (2012). The military judge sentenced Appellant to confinement for thirteen years,

reduction to the grade of E-1, "total forfeitures,"[1] and a dishonorable discharge. In accordance with a pretrial agreement, the convening authority approved only eight years of confinement and disapproved the "total forfeitures."

A. Appellant's Post-Trial Confinement Conditions[2]

The Lowndes County Jail (LCJ) is a civilian confinement facility in Lowndes County, Georgia. The Air Force pays the LCJ to detain military "personnel who are awaiting transfer to a military penitentiary, serving a sentence where a transfer to a military facility is impractical, or being held for pre-trial confinement." A Memorandum of Agreement (MOA) between the Air Force and the LCJ specifies the duties of the LCJ when incarcerating military prisoners and the compensation from the Air Force for its services. Pursuant to this MOA, the LCJ confined Appellant from May 27, 2020, until January 29, 2021.

On December 15, 2020, and January 25, 2021, with the assistance of counsel, Appellant sent two complaints regarding his confinement conditions to the commander of his unit. These complaints alleged that the LCJ failed to provide edible food and drinkable water, sanitary living

---

[1] The AFCCA addressed the "total forfeitures" portion of the sentence as follows:

> In his sentence, the military judge announced "total forfeitures," and not that Appellant was to "forfeit all pay and allowances." *See Manual for Courts-Martial, United States* (2016 ed.), Appendix 11. As the convening authority did not approve adjudged forfeitures, we need not determine whether the adjudged forfeitures were for both pay and allowances.

*Pullings*, 2021 CCA LEXIS 648, at *1 n.3, 2021 WL 5626313, at *1 n.3. We agree with AFCCA's treatment of this matter.

[2] Information about Appellant's post-trial confinement conditions comes from materials that the AFCCA considered and that are included in the Joint Appendix filed in this Court. We address below the arguments of the parties about whether we may consider this information.

quarters, prescription medicine, and adequate medical care. He asserted that these failures constituted cruel and unusual punishment in violation of Article 55, UCMJ, and the Eighth Amendment.[3] Appellant requested relief under Article 138, UCMJ, 10 U.S.C. § 938 (2018).

Appellant supported his allegations of deficient conditions in a sworn declaration. Appellant asserted that the LCJ gave him contaminated drinking water and moldy "expired food" with "various bugs, body hair, and flakes of rust" in it. Appellant alleged he suffered from food poisoning and that he lost thirty pounds as a result of the rations he consumed during his incarceration at the LCJ. Appellant further asserted that sewage water leaked into his cell from a broken toilet on the floor above; that the leaking sewage disabled the only light fixture in his cell; that insects crawled out of the drains in his cell; and that other inmates had broken toilets or sinks and had to use the toilet in a cell other than their own. Appellant also asserted that he could not clean up the dirt, mold, and mildew in his cell because cleaning supplies were provided only early in the morning, and he had no alarm clock or other means to wake himself up in time to use them.

Appellant additionally asserted that the LCJ never permitted him to go outside; that "the only sunlight that [he] received was from a small skylight on the roof of the dayroom"; that he received no opportunity for exercise; and that he could only walk in the dayroom. Appellant further declared that the LCJ took away his lawfully prescribed medicine when he arrived; that he did not see a physician for almost a month; that the LCJ withheld pain medication for the rehabilitation of his Achilles tendon; that the LCJ also denied him access to his previously issued medication

---

[3] Appellant also alleged that the LCJ put him at an increased likelihood to contract COVID-19, improperly charged him for medical care, and denied him confidential communications and unmonitored phone calls with his attorney, but he no longer presses those contentions in this appeal.

for depression and anxiety;[4] and that the LCJ did not provide him with an extra blanket to alleviate the symptoms of a medical condition called Raynaud's Syndrome.

In addition to the complaints that he sent to his commander, Appellant also submitted numerous complaints to LCJ officials. An "Inmate Grievance/Request Record" dated September 17, 2020, shows that Appellant made the following statement:

> THERE IS SO MUCH WATER DRIPPI[N]G THAT WE HAVE TO HAVE A MOP BUCKET UNDER THE LEAK AND HAVE TO EMPTY IT TWICE A DAY. THE PROBLEM IS THAT THE TOILET IS CLOGGED IN C222 AND IS CONTINUING TO OVERFLOW ON TO THE FLOOR OF THE CELL. THE WATER HAS MADE ITS WAY THROUGH THE CRACKS OF [THE] FLOOR[] [OF] C222, AND DISABLED THE LIGHTING OF C133. THERE IS ALSO WATER FLOWING DOWN THE EXTERIOR WALL OF CELL 133 AND FLOWING BACK INTO THE CELL.

The record further indicates, without additional detail, that this issue was resolved four days later.

An official from the Lowndes County Sherriff's Office who was responsible for administering the LCJ responded to Appellant's complaints in two sworn declarations. In the first declaration, dated December 31, 2020, the official stated in relevant part:

> All drink coolers are cleaned daily by the Food Service Management Company, Trinity Food Service, under the supervision of contract kitchen staff; any incidents of mold or mildew are addressed immediately. Our kitchen is graded by Lowndes County Health inspectors just like public dining establishments and we consistently pass these inspections.

---

[4] Appellant acknowledges that the LCJ did provide him with a two-week dosage of his prescribed medicine at one point.

Tap water is dispensed through the toilet/sink appliance as it is in most other correctional facilities throughout the United States. These fixtures are in common use and commonly accepted as standard water dispensing appliances by numerous detention facilities.

Concerning the appearance of vermin in the facility we have two full-time sanitation crews who clean all common areas of the facility daily and dispense cleaning supplies to inmate[s] to clean their own rooms. . . . [A]ll inmates are expected to clean their room and shower areas daily. Our sanitation crews' supervisors, shift supervisors, and jail staff are there to make sure that this is done.

Ace Pest Control comes to our facility once a month and dispenses pest control chemicals to common areas of the jail, the jail kitchen, and periodically the inmate housing areas.

I have no knowledge that Inmate Pullings has ever made these complaints to a staff member and our records indicated th[at] Inmate Pullings has only filed one grievance since his incarceration began and it was regarding the theft of property by another inmate.

In the second declaration, dated July 19, 2021, the same official wrote in pertinent part:

5. The jail follows health and safety guidelines regarding food services. The jail has a contract cleaning service that cleans common areas, and the jail provides cleaning supplies for inmates to clean their own cells. I cannot provide any further specifics on instances of mold that Inmate Pullings has referenced because he did not file any complaints. I have no knowledge of Inmate Pullings making informal complaints regarding these issues.

6. Inmates receive 3 hours of recreation time, weekly. The recreation yard is a sealed yard under a roof, with one open air window that allows in fresh air and sunlight. The window is approximately 5 feet by 10 feet. This recreation yard complies with Georgia standards.

6

7. Inmates must get approval from our medical provider in order [to] bring in medication that was not prescribed to them from our medical personnel.

8. Regarding the maintenance for the leaking cell, the jail had to replace the entire roof in order to fix the leak. While we were repairing the leak, we transferred the inmates in the affected cells to other cells that were not leaking.

A nurse affiliated with the Lowndes County Sherriff's Office also provided a declaration. She asserted that Appellant did not report that he was taking any prescription medication on intake; that he reported he was on prescription medicine on June 29, 2020; that physicians saw him shortly afterward and provided him with medicine; and that when he complained of the symptoms of Raynaud's Syndrome, he was prescribed medication to alleviate these symptoms.

### B. The AFCCA's Opinion and Our Grant of Review

The AFCCA assessed Appellant's claim of cruel and unusual confinement conditions using the test that this Court announced in *Lovett*, 63 M.J. at 215. *Pullings*, 2021 CCA LEXIS 648, at *22-23, 2021 WL 5626313, at *9. To establish a violation of Article 55, UCMJ, or the Eighth Amendment, *Lovett* requires an appellant to show:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety; and (3) that he has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ.

63 M.J. at 215 (alteration in original) (footnote omitted) (internal quotation marks omitted) (citation omitted).

Addressing Appellant's nonmedical complaints, the AFCCA held that Appellant had not satisfied the second *Lovett* requirement. *Id.* at *24-25, 2021 WL 5626313, at *10. The AFCCA explained:

> Regarding Appellant's complaints regarding food and water, the conditions of his cell, and lack of outdoor time and recreation facilities, Appellant has neither claimed nor demonstrated a culpable state of mind on the part of prison officials. Moreover, we conclude from our review of the declarations from prison officials that they were not indifferent to Appellant's health or safety. Thus, Appellant has not satisfied all three prongs of *Lovett* for these complaints.

*Id.*, 2021 WL 5626313, at *10 (footnote omitted). The AFCCA further asserted: "For example, prison officials knew that water was leaking into cells due to a roof leak. They rehoused inmates in the affected cells and replaced the roof." *Id.* at *25 n.18, 2021 WL 5626313, at *10 n.18.

Addressing Appellant's complaint about his medical care, the AFCCA held "Appellant does . . . imply a culpable state of mind in relation to his complaint regarding inadequate medical care." *Id.* at *25, 2021 WL 5626313, at *10. But the AFCCA held that Appellant had not satisfied the first requirement of the *Lovett* test because he had not shown a sufficiently serious act or omission by LCJ officials. *Id.*, 2021 WL 5626313, at *10. The AFCCA explained:

> We find the conduct of prison officials as alleged by Appellant did not constitute "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Appellant has not demonstrated that prison officials understood Appellant's needs to be significantly serious and that they ignored those needs with deliberate indifference. Moreover, Appellant does not allege he suffered harm, nor was at substantial risk of serious harm, from any of these issues. While we can presume these issues caused Appellant some discomfort and distress, more is required before we can find violations of the Eighth Amendment and Article 55, UCMJ.

*Id.* at *25-26, 2021 WL 5626313, at *10 (footnote omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

In applying the *Lovett* test, the AFCCA determined that it did not need to order a *DuBay* hearing to obtain relevant

findings of fact. 2021 CCA LEXIS 648, at \*24, 2021 WL 5626313, at \*10; *see United States v. DuBay*, 17 C.M.A. 147, 149, 37 C.M.R. 441, 413 (1967). The AFCCA reasoned that even if the documentary evidence submitted contained inconsistencies, resolving the factual disputes in Appellant's favor would not result in relief to Appellant. *Id.*, 2021 WL 5626313, at \*10.

This Court granted review of two assigned issues:

> I. In addition to prison officials, can the decisions of military personnel satisfy the "deliberate indifference" aspect of the cruel and unusual punishment test when they repeatedly send military inmates to a local civilian confinement center with a history of inhumane living conditions for inmates?

> II. Additionally or alternatively, did appellant suffer cruel and unusual punishment for 247 days and nights at Lowndes County Jail?

*United States v. Pullings*, 82 M.J. 372, 372-73 (C.A.A.F. 2022) (order granting review). As we explain below, we answer both questions in the negative.

## II. Consideration of Matters Outside the Record

Before reaching the merits of the assigned issues, we must first discuss a procedural question. Appellant did not raise the conditions of his post-trial confinement in any post-trial submissions to the convening authority, so the issue was not "raised by materials in the record." *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020); *cf. United States v. Johnson*, 81 M.J. 451, 452 (C.A.A.F. 2021) (summary disposition) (explaining that a Court of Criminal Appeals should "consider additional information about . . . post-trial confinement conditions" when the matter is raised in a "clemency response to the convening authority"). The Government argues that in deciding this appeal, we should not consider any matters outside the record. Accepting the Government's argument would prevent us from looking at any of the declarations and exhibits concerning Appellant's post-conviction confinement conditions because all these documents were

created after the completion of Appellant's trial and post-trial proceedings.

In *Jessie*, this Court held that a Court of Criminal Appeals could not consider materials outside the record in deciding whether a prison policy violated a prisoner's First Amendment rights. 79 M.J. at 444. In support of the decision, the Court cited precedents that had interpreted Article 66, UCMJ, 10 U.S.C. § 866 (2018), to require the Courts of Criminal Appeals to decide appeals upon the record. 79 M.J. at 440-41. But in reaching its conclusion, the Court recognized that its precedents were not entirely consistent. Specifically, the Court has considered materials outside the record when deciding whether post-trial confinement conditions violate the prohibitions against cruel and unusual punishment in Article 55, UCMJ, and the Eighth Amendment. *Id.* at 442-43 (citing *Pena*, 64 M.J. 259, and *Erby*, 54 M.J. 476).

Because the litigation in *Jessie* did not involve a claim of cruel and unusual punishment, and because the government had not asked the Court to overrule those precedents, the Court in *Jessie* eschewed any consideration of the validity of these differing precedents. *Id.* at 445. The Court explained:

> Consistent with the Government's proposal for accommodating the discordant precedents, all we must decide today is that the practice of considering material outside the record should not be expanded beyond the context of Article 55, UCMJ, and the Eighth Amendment. We may decide in a future case whether these holdings with respect to such claims should be overruled, modified, or instead allowed to stand as "aberration[s]" that are "fully entitled to the benefit of stare decisis" because they have become established.

*Id.* (alteration in original) (quoting *Flood v. Kuhn*, 407 U.S. 258, 282 (1972)).

This case, unlike *Jessie*, involves a claim of cruel and unusual punishment. The Government therefore asserts that we should take the opportunity to address the

10

continuing validity of *Pena*, *Erby*, and any other cases that have considered materials outside the record when adjudicating claims of cruel and unusual punishment. The Government further argues that we should overrule these precedents because they are inconsistent with Article 66, UCMJ, and Article 67, UCMJ, 10 U.S.C. § 867 (2018), which in conjunction define the appellate jurisdiction of the Courts of Criminal Appeals and this Court.

Although both parties have briefed the question of whether we should overrule *Pena* and *Erby*, we decline to reconsider these precedents in this case. As discussed below, our review of the materials outside the record leads us to conclude that the AFCCA correctly decided the case in the Government's favor. Consequently, the result of this case would be the same regardless of whether we consider materials outside the record. We therefore need not decide the continued validity of *Pena* and *Erby* at this time.

### III. Standards of Review

In *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997), we explained several principles about how appellate courts should address claims that depend on the truth of factual assertions in post-trial affidavits rather than on findings of fact by a military judge. One of these principles is that "if the facts alleged in the affidavit[s] allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis." *Id.* Like the AFCCA, we find no disagreements in the post-trial documents submitted by the parties that are relevant to our resolution of the issues before us. Accordingly, following *Ginn*, we accept the relevant allegations of Appellant and the uncontroverted allegations of the Government's witnesses as true. We have no need to order a *DuBay* hearing for further factfinding. And after accepting the parties' relevant allegations as true, we will "determine whether the facts alleged constitute cruel and unusual punishment de novo." *Lovett*, 63 M.J. at 215.

**IV. Discussion**

Appellant must prove three elements to establish his claim that his confinement conditions were cruel and unusual. First, Appellant must prove that an "objectively, sufficiently serious act or omission result[ed] in the denial of necessities." *Id.* Second, Appellant must prove "a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety." *Id.* Third, Appellant must prove that he "exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ." *Id.* (alteration in original) (internal quotation marks omitted) (citation omitted).

Appellant has grouped his complaints regarding LCJ prison conditions into four categories: (1) insufficient food and water, (2) poor cell conditions and lack of sanitation, (3) lack of air and recreation, and (4) insufficient medical care. In his briefs, Appellant asserts that the post-trial documents included in the Joint Appendix establish each of the three *Lovett* elements with respect to each of these four categories. In contrast, the Government contends that Appellant can show none of the three *Lovett* elements with respect to any prison conditions.

As described above, the AFCCA concluded that Appellant had not satisfied the *Lovett* test because he had not shown that prison officials were deliberately indifferent to his *nonmedical* needs. Additionally, the AFCCA concluded that even if prison officials were deliberately indifferent to his medical needs, Appellant could not show that his unmet *medical needs* were "serious." We reach the same conclusions. We further hold that Appellant cannot prevail based on his new argument that Air Force officials violated the prohibition against cruel and unusual punishment by sending him to the LCJ with knowledge of the poor conditions of the facility.

A. Appellant's Nonmedical Needs

Under *Lovett*, the question of whether LCJ prison officials were *deliberately indifferent* to his nonmedical needs depends on two factual questions: (1) "what the officials

knew," and (2) whether "they disregarded known risks to inmate safety." 63 M.J. at 216. Appellant addresses these factual questions with a general assertion that "LCJ prison officials responded with deliberate indifference to Appellant's confinement conditions, as evidenced by their failure to remedy any of [his alleged] denials of necessities for a significant amount of time, if at all."

We cannot agree with Appellant in connection with his complaints about the food and water in the LCJ. Appellant has failed to make the necessary showings with respect to what prison officials knew and whether they disregarded known risks to inmate safety. Appellant does not identify in his briefs or extra-record documents any instances in which he told anyone at the LCJ that he believed his food was expired, that there were improper items in his food, or that the water coolers were moldy. The evidence also indicates that the LCJ took actions to avoid such problems. An uncontradicted declaration, quoted above, explains that a contractor called Trinity Food Service cleaned the water coolers daily and immediately addressed issues of mold and that the LCJ consistently passed inspection by Lowndes County inspectors.[5]

Further, we cannot agree that Appellant has shown that LCJ officials acted with deliberate indifference with respect to his cell conditions and the lack of sanitation. Here, LCJ officials clearly knew of the problem of the leaking toilet because Appellant filed a complaint. But the record of the complaint does not suggest that the officials disregarded inmate safety. Rather, it reveals that Appellant was given a mop and bucket to capture some of

---

[5] Appellant's allegation that he sometimes received moldy, contaminated, or expired food or that the water coolers were unclean does not contradict the LCJ official's assertion that the LCJ hired Trinity Food Service to address "any incidents of mold or mildew" or that the kitchen "consistently pass[es]" Lowndes County health inspections. The uncontroverted facts in the LCJ official's affidavit show that the LCJ officials were not deliberately indifferent to the cleanliness or safety of the LCJ's food and water.

the dripping water. The uncontroverted facts in the LCJ official's affidavit also show that the LCJ officials eventually remedied the problem by replacing the roof and moving the affected inmates.

In contrast, Appellant did "not set forth specific facts" showing that he had complained about the mold, dirt, and pests, but instead makes only a "conclusory" allegation that he had notified LCJ officials about them. *Ginn*, 47 M.J at 248. And with respect to these conditions, the documents quoted above do not suggest LCJ officials disregarded inmate safety. Appellant admitted that prison officials provided him with cleaning supplies for an hour and a half each day, and the LCJ's administrator declared that the jail hired a pest control service to address vermin.

Finally, we cannot agree that Appellant has shown prison officials were deliberately indifferent with respect to his allegations concerning fresh air and exercise. Appellant has not alleged that he made anyone aware of his complaints about the lack of fresh air and exercise and therefore has not established the requisite level of knowledge. In addition, Appellant has not established that the LCJ officials disregarded inmate safety. Appellant has alleged that "the only sunlight that [he] received was from a small skylight on the roof of the dayroom." But even accepting this statement as true, the statement does not contradict the sworn declaration of the LCJ's administrator that an open five-foot by ten-foot window provided a recreation room with fresh air. In sum, Appellant has not shown prison officials were deliberately indifferent to any of his nonmedical needs.

### B. Serious Medical Needs

In *Estelle*, 429 U.S. at 104, the Supreme Court explained that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Instead, the Supreme Court ruled that "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Appellant contends that he

has met the *Estelle* standard by showing that LCJ officials took away his prescribed medicine when he first arrived at the jail in May 2020; that he did not see a physician for almost a month even though he had "chronic orthopedic, mental health, and autoimmune conditions and diseases"; that they withheld pain medication and doctors' visits for rehabilitation despite a recent surgery to repair his Achilles tendon; and that prison officials denied medication for depression and anxiety and denied him an extra blanket to alleviate his Raynaud's Syndrome. The Government responds that Appellant has not met the *Estelle* standard because he has not alleged *specific serious harms* resulting from the actions and omissions of LCJ officials.

We agree with the AFCCA and the Government that Appellant does not allege that he suffered, or was put at risk of suffering, serious harm. We thus cannot conclude that he has alleged deliberate indifference to a "serious medical need[]" within the meaning of *Estelle*. In addition, even if his unmet medical needs caused some harm, to apply the *Lovett* test, we must determine what the prison officials knew and how they responded. Here, the nurse's declaration indicates that Appellant only told LCJ officials about some of his medication conditions, and that LCJ officials did not disregard his safety with respect to the ones he disclosed. And Appellant has not shown that prison officials understood the Appellant's other medical needs or ignored them.

### C. Deliberate Indifference by Air Force Officials

Appellant argues that regardless of whether LCJ officials were deliberately indifferent, "the actions or inactions of Air Force officials *alone* are sufficient for an appellant to meet the 'deliberate indifference' burden" under *Lovett*. He contends that Air Force officials—"whether it be the security forces commander, staff judge advocate, or wing commander"—showed deliberate indifference because they continued to send prisoners to the LCJ despite its history of deficient conditions. Appellant clarifies that he is not "request[ing] a *per se* rule that if prisoners are confined at the LCJ then they are able to meet their deliberate indifference

15

burden" but is instead "only requesting this Court acknowledge the basic legal principle that the actions of one actor can be attributed to another actor by virtue of a legal relationship and tethering between the two." The Government responds that expanding the test to Air Force officials who send incarcerated military personnel to a specific prison would make the test unmanageable. The Government explains that it would be difficult to decide how many abuses must have occurred in the past, whether the abuses must have been similar, how substantiated past abuses have been, and what level of knowledge prison officials must have had, and other similar questions.

Appellant's argument, as we understand it, might be rephrased in the form of a syllogism. The major premise of this syllogism would be that Air Force officials violate Article 55, UCMJ, if they send a prisoner to a civilian facility that they know has a history of cruel and unusual conditions. The minor premise would be that Air Force officials knew that the LCJ is a civilian facility with a history of cruel and unusual conditions. The conclusion would be that Air Force officials therefore violated Article 55, UCMJ, and the Eighth Amendment when they sent Appellant to the LCJ.

We cannot accept either the major or minor premises of this syllogism and are therefore unpersuaded by Appellant's argument. Although the major premise of this syllogism might be true in some cases, it is not always true. For example, even if Air Force officials send a prisoner to a civilian facility that they know has a history of past abuses, no violation of Article 55, UCMJ, and the Eighth Amendment can occur unless the prisoner in fact suffers ill treatment within the facility and files a grievance and Article 138, UCMJ, petition about it.[6]

The minor premise is also unfounded. We have insufficient information about the number and nature of past

---

[6] Perhaps the major premise could be qualified in some way and restated so that it would be generally true, but we cannot discern what it would be from Appellant's briefs.

problems or the culpability of prison officials to draw specific conclusions about the LCJ's history of violations or Air Force officials' knowledge of them. All the sworn declarations and other materials included in the Joint Appendix concern Appellant's confinement conditions, but they provide scant information about the LCJ's history. And Appellant's references to other litigation concerning conditions at the LCJ are insufficient to prove that the LCJ is a civilian facility with a consistent history of cruel and unusual conditions. For these reasons, we must reject Appellant's arguments that he has shown that Air Force officials acted with "deliberate indifference" under *Lovett*.

## V. Conclusion

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Judge HARDY concurring in the judgment.

Appellant seeks sentence reassessment based on the theory that the allegedly cruel or unusual conditions he experienced during his post-conviction confinement unlawfully increased the severity of his adjudged sentence. Both in its brief and at oral argument, the Government expressly challenged this Court's precedents endorsing that legal theory, arguing that those cases were wrongly decided and that the fundamental issue presented in this case—whether Appellant suffered cruel or unusual punishment during his post-conviction confinement—falls beyond this Court's authority to act under Article 67(c), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 867(c). In the alternative, the Government also argued that Appellant did not establish that he suffered cruel or unusual punishment and is not entitled to relief.

Agreeing with the Government's alternative argument, the Court affirms Appellant's findings and sentence without reaching or deciding its primary one. I concur with the Court's judgment affirming Appellant's findings and sentence, but I write separately to express my view that this Court lacks the authority to order the Court of Criminal Appeals (CCA) to reassess Appellant's sentence based on his claim that he suffered cruel or unusual punishment during post-conviction confinement. For that reason—and as explained in more detail below—I would overrule this Court's decision in *United States v. White*, 54 M.J. 469, 472 (C.A.A.F. 2001), and deny Appellant relief on that ground. Because the Court has specifically invited argument about whether *White* and its progeny should be overruled, I anticipate that we soon will see this important issue again.

## I. Introduction

As relevant to this case, Congress has authorized this Court to act with respect to one, and only one, thing: "the findings and sentence set forth in the entry of judgment, as affirmed or set aside as incorrect in law by the Court of Criminal Appeals." Article 67(c)(1)(A), UCMJ. The entry of judgment—as affirmed by the CCA below—sentenced Appellant to a dishonorable discharge, confinement for eight years, and reduction to the grade of E-1. *United States v.*

*Pullings,* No. ACM 39948, 2021 CCA LEXIS 648, at *1-2, 2021 WL 5626313, at *2, *10 (A.F. Ct. Crim. App. Nov. 30, 2021) (unpublished). All parties agree that Appellant's sentence as "set forth in the entry of judgment" and as affirmed by the CCA was lawful *at the time it was adjudged.*[1] Nevertheless, Appellant asks us to order the CCA to reassess his adjudged sentence (since we have no authority to grant any other relief) because he claims that he suffered cruel or unusual punishment during his post-conviction confinement. What, one might reasonably ask, does this claim have to do with Appellant's adjudged sentence, as set forth in the entry of judgment and affirmed by the CCA? The simple answer is nothing. Whether Appellant suffered cruel or unusual punishment during his post-conviction confinement has no bearing on the only question that this Court is authorized to consider: whether the sentence adjudged by his court-martial and affirmed by the CCA was lawful.

As legislatively created Article I courts, this Court and the CCAs are courts of "narrowly circumscribed" jurisdiction. *Clinton v. Goldsmith* (*Goldsmith II*), 526 U.S. 529, 535 (1999).[2] Nevertheless, over time, both our predecessor Court and then this Court came to view themselves as having "broad jurisdiction under the Uniform Code of Military Justice to correct injustices." *Goldsmith v. Clinton* (*Goldsmith I*), 48 M.J. 84, 91 (C.A.A.F. 1998) (Sullivan, J., concurring). For example, in *United States v. Frischholz,* our predecessor Court expressed its view that its authority was

---

[1] Appellant's counsel conceded at oral argument that Appellant's sentence was lawful at the time of entry of judgment. Oral Argument at 10:58:15-10:58:25, *United States v. Pullings* (C.A.A.F. Nov. 8, 2022) (No. 22-0123).

[2] "Courts created by statute can have no jurisdiction but such as the statute confers." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988) (internal quotation marks omitted) (quoting *Sheldon v. Sill*, 49 U.S. 441, 449 (1850)); *see also Ctr. for Const. Rts. v. United States*, 72 M.J. 126, 128 (C.A.A.F. 2013) ("In particular, this Court, and courts-martial in general, being creatures of Congress created under the Article I power to regulate the armed forces, must exercise their jurisdiction in strict compliance with authorizing statutes.").

not defined solely by Article 67, UCMJ, but also extended to "the protection and preservation of the Constitutional rights of persons in the armed forces." 16 C.M.A. 150, 151-52, 36 C.M.R. 306, 307-08 (1966). The following year the Court further explained its belief that Article 67, UCMJ, "indicates the intent of Congress to confer upon this Court a general supervisory power over the administration of military justice." *Gale v. United States*, 17 C.M.A. 40, 42, 37 C.M.R. 304, 306 (1967). In short, the Court believed that—regardless of the limitations placed on our authority by Article 67, UCMJ—"an accused who has been deprived of his rights need not go outside the military justice system to find relief in the civilian courts of the Federal judiciary." *United States v. Bevilacqua*, 18 C.M.A. 10, 11-12, 39 C.M.R. 10, 11-12 (1968).

This expansive view of our purpose and authority eventually culminated in a decision from our Court, *United States v. White*, in which this Court held that we have a duty to consider, as part of our Article 67 review on direct appeal, any claims by an appellant that his post-conviction confinement conditions violate the Eighth Amendment or Article 55, UCMJ, 10 U.S.C. § 855. 54 M.J. at 472 (holding that this Court has "jurisdiction under Article 67(c) to determine on direct appeal if the adjudged and approved sentence is being executed in a manner that offends the Eighth Amendment or Article 55"). I cannot go along with such a fundamental and unauthorized expansion of this Court's power that has no statutory basis. Instead, for the reasons explained below, I would hold that this Court has no authority to entertain Appellant's post-conviction confinement Eighth Amendment and Article 55 claims and deny relief on that ground.

## II. *White* and Its Progeny Contradict the Text of Articles 66 and 67, UCMJ

In recent years, this Court has repeatedly expressed doubt about its holding in *White*, as well as its holding in *United States v. Erby*, 54 M.J. 476, 478 (C.A.A.F. 2001), a second case released the same day in which this Court held that the CCA's are similarly empowered to hear post-conviction confinement cruel or unusual punishment claims under Article 66, UCMJ, 10 U.S.C. § 866. Our recent

opinions have recognized what was obvious from the start: *Erby* and *White* contradict the plain text of Articles 66 and 67, UCMJ. In *United States v. Jessie*, we acknowledged that we "may decide in a future case whether [*Erby* and *White*] should be overruled, modified, or instead allowed to stand as 'aberration[s]' that are 'fully entitled to the benefit of stare decisis' because they have become established." 79 M.J. 437, 445 (C.A.A.F. 2020) (second alteration in original) (citation omitted). In *United States v. Guinn*, we recognized that it "may be argued that this Court's precedents regarding the scope of a CCA's responsibilities under Article 66(c) are not properly predicated on the plain language of that statute," but failed to reach the merits of that question because the government did not ask us to overturn our precedents. 81 M.J. 195, 204 (C.A.A.F. 2021); s*ee also id.* at 205 (Maggs, J., concurring) (opining that a party could ask this Court to reconsider its precedents in a future case such that this Court could evaluate the merits of such an argument at that time). Most recently, in *United States v. Willman*, we once again noted that arguments can be made that this Court's decisions in these post-conviction confinement conditions cases are not properly predicated on the plain language of Articles 66 and 67, UCMJ. 81 M.J. 355, 360 (C.A.A.F. 2021).

In this case, the Government accepted the invitation that this Court extended in *Guinn* by challenging our authority to hear Appellant's claims and requesting that we overturn our cases holding otherwise. *See* Brief for Appellee at 18, *United States v. Pullings*, No. 22-0123 (C.A.A.F. Jul. 29, 2022) (asking this Court to overrule its line of cases in which it asserted authority over claims that are based on post-trial confinement conditions); *see also id.* at 25 ("This Court should hold that it and the CCAs have no jurisdiction to review post-trial confinement conditions that were not part of the sentence entered into judgment.").

Appellant's challenge to his sentence is the type of case that falls squarely within this Court's jurisdiction under Article 67(a)(3), UCMJ: a case "reviewed by a Court of Criminal Appeals in which, upon petition of the accused and on good cause shown, the Court of Appeals for the Armed Forces has granted a review." But Article 67(a),

4

UCMJ, does not impose the only restriction on our authority. As relevant here, Article 67(c)(1)(A) further states that this Court may act only with respect to "the findings and sentence *set forth in the entry of judgment*, as affirmed or set aside as incorrect in law by the Court of Criminal Appeals." (emphasis added). Accordingly, this Court routinely hears challenges to the lawfulness of an appellant's adjudged sentence. *See, e.g.*, *United States v. Dinger*, 77 M.J. 447, 448 (C.A.A.F. 2018) (holding that a court-martial is not prohibited from adjudging a punitive discharge to a retiree); *United States v. Christian*, 63 M.J. 205, 206 (C.A.A.F. 2006) (holding that life without eligibility for parole was an authorized court-martial sentence for the crime of forcible sodomy of a child under twelve years of age during the relevant time period).

But I agree with the Government that the cases beginning with *White* that extended our Article 67(c) authority to include review of whether the appellant's adjudged and approved sentence is being executed in a manner that offends the Eighth Amendment or Article 55, UCMJ, violate the plain language of Articles 66 and 67, UCMJ. As relevant here, Article 66(d)(1)(A), UCMJ, authorizes a CCA to "act only with respect to the findings and sentence as entered into the record." Similarly, pursuant to Article 67(c)(1)(A), UCMJ, this Court may act only with respect to "the findings and sentence" as affirmed or set aside by the CCA. Post-conviction confinement conditions are not part of the "findings and sentence" with respect to which this Court or the CCAs are authorized to act.[3] Findings consist of: (1) a summary of each charge and specification; (2) the pleas of the accused; and (3) the finding or other disposition of each charge and specification. Rule for Courts-Martial (R.C.M.) 1101(a)(1) (2019 ed.). The sentence consists of: (1) the sentence of the court-martial; (2) the date the sentence was announced; and (3) the amount of credit, if any,

---

[3] Given the CCA's broad and unique authority under Article 66, UCMJ, I would leave for another time the question whether the CCAs have jurisdiction to hear post-conviction confinement claims. That said, post-conviction confinement claims are not part of the findings and sentence, and the CCAs cannot assert jurisdiction over such claims under Article 66(d)(1)(A), UCMJ.

applied to the sentence for pretrial confinement or other reasons.[4] R.C.M. 1101(a)(2).

Based on the plain language of these provisions (and as a matter of logic and common sense), post-conviction confinement conditions cannot be part of the findings or sentence of a court-martial unless those conditions are specified by the court-martial and entered in the record. *See Guinn*, 81 M.J. at 206 (Ryan, S.J., dissenting) (treating post-conviction confinement conditions as obviously outside the bounds of Article 66's "findings and sentence" requirement). But, on a more fundamental level, it is temporally impossible for post-conviction confinement conditions to be part of a sentence under the implementing provisions in the *Manual for Courts-Martial, United States* (*Manual*). A court-martial sentence is executed and takes effect when the judgment is entered into the record under R.C.M. 1111. R.C.M. 1102(a)(1). The judgment consists of the court's findings and sentence. R.C.M. 1111(b). Judgments are final upon entry, *and cannot be altered*, unless the military judge corrects a clerical error within fourteen days of its entry, the Judge Advocate General or a military appellate court modifies the judgment in performance of their duties, or a military judge modifies a judgment consistent with the limited purposes of a remand from a higher court. R.C.M. 1111(c). Given that the sentence is a component of a court-martial's judgment, it cannot be modified outside the bounds of R.C.M. 1111(c) because any change in the sentence would necessarily modify the judgment.

Accordingly, if an accused's sentence is lawful at the time of the entry of judgment, events that occur after the entry of judgment cannot be considered as part of the sentence such that its legality or appropriateness is affected. In other words, but for the exceptions enumerated in R.C.M. 1111(c), a sentence is fixed upon the entry of judgment and post-conviction confinement conditions cannot

---

[4] R.C.M. 1101(a)(2) includes additional components of a sentence if the accused was convicted of more than one offense, none of which can be reasonably construed to apply to post-conviction confinement conditions.

retroactively alter the sentence. Perhaps in recognition of this fact, Appellant has not challenged the lawfulness of his sentence as adjudged by his court-martial.[5] Instead, Appellant specifically seeks a reduction in his adjudged sentence as a remedy for cruel or unusual punishment that he allegedly suffered during his post-conviction confinement in a civilian jail. The plain language of Article 67, UCMJ, does not confer authority on this Court to hear Appellant's claim.

### III. *White* Flouted the Supreme Court's Decision in *Clinton v. Goldsmith*

In *Goldsmith I*, Major James Goldsmith sought to enjoin the President's order dropping Goldsmith from the rolls of the Air Force two years after Goldsmith was convicted of various offenses by a general court-martial.[6] 48 M.J. at 85-86. Like Appellant here, Goldsmith did not challenge the lawfulness of the findings of guilt or the sentence adjudged by his court-martial. Instead, Goldsmith sought extraordinary relief from our Court, arguing that the President's action dropping him from the roles of the Air Force violated the Ex Post Facto and Double Jeopardy Clauses of

---

[5] This Court granted review of two questions, both solely related to Appellant's claim that he suffered cruel or unusual punishment in post-conviction confinement:

> I. In addition to prison officials, can the decisions of military personnel satisfy the "deliberate indifference" aspect of the cruel and unusual punishment test when they repeatedly send military inmates to a local civilian confinement center with a history of inhumane living conditions for inmates?

> II. Additionally or alternatively, did Appellant suffer cruel and unusual punishment for 247 days and nights at Lowndes County jail?

*United States v. Pullings*, 82 M.J. 372, 372-73 (C.A.A.F. 2022) (order granting review).

[6] In the then recently enacted National Defense Authorization Act for Fiscal Year 1996, Congress had authorized the President to drop from the rolls of the armed forces any servicemember who, like Goldsmith, had been sentenced by court-martial to more than six months of confinement and had served at least six months. *Goldsmith II*, 526 U.S. at 532 (citing 10 U.S.C. § 1161(b) and 10 U.S.C. § 1167 (1994 & Supp. III 1998)).

the Constitution. *Id.* at 89-90. Consistent with its belief that "Congress intended for this Court to have broad responsibility with respect to administration of military justice," this Court held that it had jurisdiction over Goldsmith's case under the All Writs Act, 28 U.S.C. § 1651(a) even though he was not challenging the findings or sentence from his court-martial. *Goldsmith I*, 48 M.J. at 86-87.

In a brief, unanimous opinion, the Supreme Court reversed *Goldsmith II*, 526 U.S. at 540. In doing so, the Supreme Court expressly rejected both this Court's majority view that Congress intended C.A.A.F. " 'to have broad responsibility with respect to the administration of military justice,' " *id.* at 534 (quoting *Goldsmith I*, 48 M.J. at 86-87), as well as Judge Sullivan's "more emphatic" view that this Court " 'should use our broad jurisdiction under the [UCMJ] to correct injustices,' " *id.* at 534 n.6 (alteration in original) (quoting *Goldsmith I*, 48 M.J. at 91 (Sullivan, J., concurring)). The Supreme Court then explained that based on the plain language of Articles 66 and 67, UCMJ, the President's action dropping Goldsmith from the rolls was an executive action—not a finding or sentence that was imposed by Appellant's court-martial—and was thus "straightforwardly" beyond this Court's jurisdiction. *Id.* at 535. Even though Goldsmith's conviction and sentence was a but-for cause of the President's later action, this Court had no authority to hear Goldsmith's constitutional claims because they fell "outside of the CAAF's express statutory jurisdiction." *Id.* at 540.

That logic applies with equal force here. All the actions that form the basis of Appellant's cruel or unusual punishment claim are also post-conviction executive actions, rather than a finding or sentence that was imposed by his court-martial. Both the Georgia prison administrators at Lowndes County Jail (LCJ) and the Air Force officers responsible for issuing the Memorandum of Agreement authorizing Appellant's confinement at LCJ are independent executive agents acting outside the military justice system. Any actions taken by them that affected the execution of Appellant's sentence are exactly the kinds of actions that the Supreme Court declared outside of our authority to review in *Goldsmith II*.

8

*Goldsmith II* cannot be distinguished on the basis that this Court invoked the All Writs Act in granting Goldsmith relief. In its opinion, the Supreme Court *first* concluded that the President's action dropping Goldsmith from the rolls of the Air Force was beyond this Court's authority to review, and *then* separately rejected the argument that this Court had jurisdiction under the All Writs Act because this Court's action enjoining the President "protected and effectuated the sentence meted out by the court-martial." *Id.* at 535-36. The Supreme Court could not have been more clear when it held that "CAAF is not given authority, by the All Writs Act or otherwise, to oversee all matters arguably related to military justice, or to act as a plenary administrator even of criminal judgments it has affirmed." *Id.* at 536. That statement remains just as true now as it did then, and this Court erred when it held otherwise in *White*.

## IV. The Stare Decisis Factors Do Not Support Maintaining *White*

Having concluded that Article 67, UCMJ, denies this Court authority to hear Appellant's Eighth Amendment and Article 55 claims, I further believe that the doctrine of stare decisis does not support maintaining *White*. When this Court considers whether to overturn our precedent, we consider four factors: (1) whether the prior decision was poorly reasoned or has proven to be unworkable; (2) any intervening events; (3) the reasonable expectations of servicemembers; and (4) the risk of undermining public confidence in the law. *United States v. Blanks*, 77 M.J. 239, 242 (C.A.A.F. 2018). Although there have not been any intervening events that require the abrogation of *White*, the other stare decisis factors provide compelling reasons to abandon that precedent.

### A. *White* Was Poorly Reasoned

This Court's decision in *White*, and the earlier separate opinions upon which that decision relied, were poorly reasoned because they disregarded the plain text of Article 67, UCMJ, in pursuit of a well-intentioned but unlawful desire to exercise a general supervisory power over all aspects of military justice. In *White*, this Court asserted—without any analysis beyond citations to a prior concurrence and

9

dissent—that Article 67(c), UCMJ, authorized this Court not only to determine whether an appellant's sentence as adjudged by his court-martial was lawful, but *also* the "authority to ensure that the severity of the adjudged and approved sentence has not been unlawfully increased by prison officials, and to ensure that the sentence is executed in a manner consistent with Article 55 and the Constitution." 54 M.J. at 472. Even the prior separate opinions cited by this Court in *White* provide little additional explanation. They did not wrestle with the text of Article 67, UCMJ, or explain how post-conviction confinement conditions could be considered part of "the findings and sentence set forth in the entry of judgment." Article 67(c)(1)(A), UCMJ; *see* Part II, *supra*. Instead, they merely asserted that because Article 55, UCMJ, prohibits the infliction of cruel or unusual punishment upon any servicemember, any allegation of such punishment "is unquestionably a matter of codal concern." *United States v. Sanchez*, 53 M.J. 393, 398 (C.A.A.F. 2000) (Sullivan, J., dissenting).

In other words, this Court seemed to have believed that because Article 55, UCMJ, prohibits cruel or unusual punishment, this Court must have authority to hear any case alleging such violations, regardless of the limitations placed on this Court by Article 67, UCMJ. But neither the Eighth Amendment nor Article 55, UCMJ, provides any legal basis for extending this Court's narrowly circumscribed Article 67 authority to all purportedly unlawful—or even unconstitutional—executive actions that are arguably related to the administration of military justice.

In *White* this Court casually brushed aside the argument that the Supreme Court's decision in *Goldsmith II* foreclosed our jurisdiction to consider post-conviction confinement claims. In only two sentences of analysis, this Court concluded *Goldsmith II* did not control the outcome for two reasons, neither of which justified this Court's deviation from the plain language of Articles 66 and 67, UCMJ. First, the Court noted that the statute that authorized the President to drop Goldsmith from the rolls was not part of the UCMJ, and thus "not within this Court's jurisdiction." *White*, 54 M.J. at 472. But this Court's authority is not determined by where a federal statute

appears in the United States Code, but by the text of Article 67, UCMJ, which, as relevant here, limits our authority to act to "the findings and sentence set forth in the entry of judgment." Moreover, even if this argument had any relevance, it would apply even more forcefully here where the conditions at a Georgia jail are a matter of state rather than federal law.

The second reason given by this Court in *White*—that the case involved "the imposition of a punishment under the UCMJ" in a case that was before this Court on direct review, *id.*—is equally unpersuasive. This logic ignored the Supreme Court's reproach in *Goldsmith II* that this Court has no authority "to act as a plenary administrator even of criminal judgments it has affirmed." 526 U.S. at 536. Nor does it make any difference that the case in *White* was before this Court on direct review rather than as an extraordinary writ. As the Supreme Court explained in *Goldsmith II*, and as the text of the All Writs Act itself makes clear, the All Writs Act is not an independent source of jurisdiction. *Goldsmith II*, 526 U.S. at 534-35 (quoting 28 U.S.C. § 1651(a) and explaining that the All Writs Act "authorizes employment of extraordinary writs . . . 'in aid of' the issuing court's jurisdiction" but does not "enlarge that jurisdiction"). Whether this Court is reviewing a case on direct or collateral review, our authority remains the same: we may only act with respect to "the findings and sentence set forth in the entry of judgment." This Court's decision in *White* offered no justification for disregarding this fundamental limitation.

### B. *White* Is Unworkable

This Court's decision in *White* has also proven to be unworkable. Because the facts relevant to post-conviction cruel or unusual punishment claims all occur after the entry of judgment, none of those facts appear in the record of trial. Unsurprisingly—given the restriction placed on this Court's authority by Article 67, UCMJ—neither the UCMJ nor the *Manual* accommodates our review of such claims. Our response to this procedural challenge has been to allow appellants raising Eighth Amendment or Article 55, UCMJ, claims to present additional, outside-the-record evidence to support their claims. *See Jessie*, 79 M.J. at 444

(describing our practice). But as we have previously noted, our "discordant precedents" authorizing this practice never addressed the language in Article 66(c), UCMJ, limiting the CCA's review to the "entire record" or our prior precedents strictly enforcing that limitation. *Id.* at 444-45.

The extra-statutory accommodations that this Court has imposed to enable the review of post-conviction confinement Eighth Amendment and Article 55 claims have repeatedly led to additional questions for which there are no easy or satisfying solutions. Essentially, those cases have asked whether, having deviated so far from the UCMJ and the *Manual* to review Eighth Amendment and Article 55 claims in *White*, should we also do so for other reasons? In *Guinn*, for example, a divided Court held that the CCA erred when it declined to consider whether an appellant's post-conviction confinement conditions violated his First or Fifth Amendment rights, even if those conditions did not amount to cruel or unusual punishment. 81 M.J. at 201. This Court expressly disclaimed that it intended to turn the CCAs into clearinghouses for military prisoners' post-conviction confinement complaints, *id.* at 203, but there is no limiting principle to this Court's logic. If *White* and its progeny authorize the CCAs to review Eighth Amendment and Article 55 claims, then why not First and Fifth Amendment claims? And if First and Fifth Amendment claims are reviewable, then why not something else? *See Jessie*, 79 M.J. at 444 (explaining that the lack of any limiting principle in our post-conviction confinement conditions cases threaten to render the limiting language in Article 66(c) superfluous).

Even when this Court has declined to further extend *White's* logic, the result is an odd paradigm of seemingly contradictory precedents. In *Jessie*, this Court decided—over two dissents—that the CCAs do not have the authority to consider completely outside-the-record materials to determine whether an appellant's post-conviction confinement conditions violated his First or Fifth Amendment rights. 79 M.J. at 438. Similarly, in *Willman*, we decided—again with two judges in dissent—that the CCAs do not have the authority to consider outside-the-record materials submitted to the court in support of an Eighth Amendment

or Article 55 claim when performing sentence appropriateness review. 81 M.J. at 356-57. This Court admitted that its ruling created an "odd paradigm" where a CCA could consider outside-the-record materials for some reasons but not for others but concluded that the oddness was justified by our reluctance to deviate even farther from the text of the UCMJ. *Id*. at 360.

No matter how well intentioned this Court's decision in *White* might have been, that opinion sent us down a difficult path of trying to solve alleged injustices without any foundation in the UCMJ for so doing. Despite our best efforts, we have left in our wake a series of seemingly arbitrary and conflicting lines of precedent to apply in post-conviction confinement cases. This Court's decision in *White* was wrong from the start, and we should stop making additional bad decisions on the inertial force of our prior mistakes.

### C. There Are No Reliance Interests to Undermine by Overturning *White*

*White* and its progeny allow incarcerated servicemembers to ask the military appellate courts to reduce their adjudged sentence as a remedy for allegedly unlawful post-conviction confinement conditions. If this Court overruled *White* and eliminated this judicially created scheme—which has no parallel in the civilian courts—servicemembers would find themselves in the same position as every other federal prisoner in the country.[7] They could still seek

---

[7] As an aside, it bears mentioning that *White* and its progeny only allow the military appellate courts to hear Eighth Amendment and Article 55 claims on *direct* review. Incarcerated servicemembers who allegedly suffer cruel or unusual punishment after their direct appeals under Article 66 and 67, UCMJ, have been completed are already in the same situation as civilian prisoners. This Court once suggested in dicta that we also have the authority to review a collateral attack on conditions of confinement, *see White*, 54 M.J. at 472 (expressing confidence that *Goldsmith II* would not preclude this Court from doing so), but this Court never subsequently held that it had that authority. As a result—and in yet another example of the absurdity of the *White* line of precedent—servicemembers can only seek sentence

13

injunctions or damages as a remedy for the allegedly unlawful confinement conditions in the federal district courts, two remedies that the military appellate courts are generally powerless to impose.

In the past, some observers have implied that there might be reliance interests in this Court's assertion of jurisdiction over post-conviction confinement Eighth Amendment and Article 55, UCMJ, claims due to the limitations of the *Feres* doctrine. *See, e.g.*, *Jessie* 79 M.J. at 447 n.1 (Ohlson, J., dissenting) (noting that claims that federal civilian courts can award damages to military prisoners "offers false hope given that the *Feres* doctrine prohibits lawsuits by military prisoners against the federal government"). But legitimate concerns about the *Feres* doctrine do not justify maintaining *White* and its progeny.

The Federal Tort Claims Act (FTCA) renders the United States liable to all persons, including servicemembers, injured by the negligence of federal government employees subject to several exceptions. 28 U.S.C. §§ 2671-2680 (outlining the procedure for bringing tort claims against the federal government). One of those exceptions applies to "[a]ny claim arising out of the *combatant* activities of the military or naval forces, or the Coast Guard, *during time of war*." *Id.* § 2680(j) (emphasis added). In *Feres v. United States*, the Supreme Court interpreted that exception as barring all claims for injuries suffered by servicemembers during any activity incident to their military service, regardless of the type of activity from which the injury arose or whether the injury was suffered during wartime. 340 U.S. 135, 146 (1950). As noted by Justice Scalia, "*Feres* was wrongly decided and heartily deserves the widespread, almost universal criticism it has received." *United States v. Johnson*, 481 U.S. 681, 700-01 (1987) (Scalia, J., with whom Brennan, J., Marshall, J., and Stevens, J., joined, dissenting) (internal quotation marks omitted) (citation omitted).

---

reductions for unconstitutional confinement conditions that occur before their direct appeals become final.

Nevertheless, *Feres* remains good law, leading courts to hold that tort claims against the federal government for injuries suffered by incarcerated servicemembers are barred under the *Feres* doctrine. *See*, *e.g.*, *Walden v. Bartlett*, 840 F.2d 771, 774 (10th Cir. 1988) (holding that confinement in a military facility is part of a uniquely military relationship such that it is incident to the servicemembers military service under *Feres*); *see also Schnitzer v. Harvey*, 389 F.3d 200, 203 (D.C. Cir. 2004) (collecting cases). One can only hope that recent cases refusing to apply the *Feres* doctrine will convince the Supreme Court to reconsider its interpretation of the FTCA. *See*, *e.g.*, *Spletstoser v. Hyten*, 44 F.4th 938, 959 (9th Cir. 2022) (affirming the district court's refusal to dismiss tort claims against the federal government brought by a servicemember who alleges that she was sexually assaulted by a superior officer); *see also Doe v. United States*, 141 S. Ct. 1498, 1499 (2021) (Thomas, J, dissenting from the denial of certiorari) (urging his fellow justices to abandon the *Feres* doctrine if they cannot find a way to "rein it in").

But even if confined servicemembers remain barred from recovering money damages from the federal government by the *Feres* doctrine, that does not justify a judicially created scheme to circumvent the doctrine by compensating servicemembers for unlawful confinement conditions by reducing their adjudged sentences. Besides violating the limits of our narrowly circumscribed authority, the scheme reeks of judicial lawmaking. Congress never gave this Court the authority to ensure that a servicemember's lawfully adjudged and approved sentence was being executed in a manner that does not offend the Eighth Amendment or Article 55, UCMJ. And Congress never gave any federal court the authority to reduce a lawfully adjudged and approved sentence as compensation for cruel or unusual punishment. There cannot be any legitimate reliance interests in such a scheme.

### D. Overturning *White* Would Not Undermine Public Confidence in the Law

The final factor in our stare decisis analysis asks whether public confidence in this Court will be undermined if we overturn our prior precedent. Here, I believe that

maintaining *White* and its progeny does more to undermine public confidence than overturning it does. As noted above, this Court has repeatedly cast doubt on the legitimacy of *White* while simultaneously struggling to reconcile and accommodate the extra-statutory duties that those cases have imposed on the military appellate courts.

This Court originally started down this path to effectuate its belief that it possessed a "broad responsibility with respect to the administration of military justice." *Goldsmith I*, 48 M.J. at 86-87. But, to my knowledge, this Court has never granted relief based on violations of an appellant's Eighth Amendment or Article 55 rights based on post-conviction confinement conditions, so it is questionable how effective this fool's errand has been. Indeed, there is a good argument to be made that servicemembers would be better off presenting their cruel or unusual punishment claims to a federal district court in the first instance. In my view, it would only improve the public confidence in the law if we admitted our mistake, overturned *White*, and abandoned the practice of hearing post-conviction confinement cruel or unusual punishment claims raised on direct review.

## V. Conclusion

Because I believe that *White* and its progeny contravene the text of Articles 66 and 67, UCMJ, and that this Court has no authority to hear claims based on post-conviction confinement conditions, I would affirm Appellant's findings and sentence without reaching the merits of either granted issue.